**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **Capital One, National Association**<br>***Plaintiff*,**<br>**v.**<br>**Federal Deposit Insurance Corporation**<br>***Defendant*.** | **No. 1:25-cv-1515**<br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff, Capital One, National Association ("CONA"), through its undersigned counsel, hereby files this Complaint against Defendant, the Federal Deposit Insurance Corporation ("FDIC"), and alleges as follows:

## NATURE OF THE ACTION

1. This action is about the FDIC's impermissible attempts, dating back to 2023, to collect an outsized and improperly calculated special assessment of approximately $475 million from CONA – $149 million of which CONA does not owe – after the FDIC made whole the uninsured depositors of two failed banks.

2. In March 2023, both Silicon Valley Bank ("SVB") and Signature Bank ("Signature") experienced debilitating runs on their customer deposits and failed. A substantial portion of these banks' customer deposits – approximately 88% and 67% of the total deposits, respectively – were above the FDIC's $250,000 insurance limit and therefore constituted "uninsured deposits."

3. The FDIC took action to protect SVB's and Signature's depositors. In addition to protecting the insured depositors, the FDIC invoked its statutory authority to take the further step of protecting all of SVB's and Signature's uninsured depositors. To do so, the FDIC utilized funds from the Deposit Insurance Fund ("DIF").

4. In November 2023, to recoup the loss to the DIF from protecting uninsured depositors, the FDIC implemented a special assessment on certain larger FDIC-insured banks (the "Special Assessment Rule"), including CONA. *See* Special Assessment Pursuant to Systemic Risk Determination, 88 Fed. Reg. 83329 (Nov. 29, 2023) (codified at 12 C.F.R. § 327.13).

5. Pursuant to the Special Assessment Rule, the amount of each FDIC-insured bank's special assessment is calculated based on each bank's estimated uninsured deposits as reported on its Consolidated Reports of Condition and Income (the "Call Report"),[1] as of December 31, 2022, as the Call Report stood as of the later of (i) November 2, 2023, or (ii) the date of the bank's most recent amendment to its Call Report arising from, or confirmed through, the FDIC's Assessment Reporting Review.[2] 12 C.F.R. § 327.13(f) (2023). The Special Assessment Rule, therefore, specifically requires the assessments to be based on a bank's Call Report and accounts for amendments to a bank's Call Report.

6. In calculating the special assessment for CONA, the FDIC has included as an uninsured deposit an approximately $56 billion intercompany position between CONA and Capital

---

[1] A Call Report is a quarterly report of a bank's condition and income that is used for, among other purposes, assessing the financial health and risk profile of the bank when calculating its quarterly assessment.

[2] The Special Assessment Rule preamble contemplates that the FDIC will conduct "a review (Assessment Reporting Review) of the reporting methodology for estimated uninsured deposits . . . [which] may result in amendments to uninsured deposits . . . reported on the Call Report if the FDIC determines that an institution is not reporting these items in accordance with the instructions." 88 Fed. Reg. 83337.

One Funding, LLC ("Funding"), a wholly owned subsidiary of CONA, and an $189 million intercompany position between CONA and another wholly owned subsidiary, Capital One Auto Receivables, LLC ("COAR") (collectively, the "Intercompany Position")[3], despite the fact that the Intercompany Position was not reported on CONA's December 31, 2022 Call Report as of November 2, 2023 nor as of an amended December 31, 2022 Call Report arising from, or confirmed through, the FDIC's Assessment Reporting Review.

7. CONA disputes that the Intercompany Position between CONA and Funding is an uninsured deposit that is subject to the Special Assessment Rule for three reasons.

8. First, the Intercompany Position does not meet the statutory definition of "deposit" in the Federal Deposit Insurance Act ("FDIA"). *See* 12 U.S.C. § 1813(*l*).

9. Second, the Intercompany Position is not reflected as a deposit on the operative CONA Call Report from which the Special Assessment Rule required CONA's special assessment to be calculated. Although CONA's originally filed December 31, 2022 Call Report (the "Original December 2022 Call Report") erroneously included the Intercompany Position as an uninsured deposit, CONA subsequently amended that Call Report on June 29, 2023, to address that error (the "Revised December 2022 Call Report"). As such, per the express terms of 12 C.F.R. § 327.13(f), the FDIC should not have included the Intercompany Position in its calculation.

10. Third, CONA effectuated a retroactive distribution of nearly all of the $56 billion Intercompany Position, effective as of October 1, 2022, such that the Intercompany Position was reduced to approximately $2 billion prior to December 31, 2022. This distribution was declared

[3] The allegations that follow relate solely to the more than 99.5% of the Intercompany Position that is attributable to the intercompany position between CONA and Funding. However, for the same reasons, relief is sought with respect to both the Funding and COAR intercompany positions.

on June 23, 2023, and the Revised December 2022 Call Report was filed on June 29, 2023, months before the "as of November 2, 2023" Call Report date that 12 C.F.R. § 327.13(f) instructs the FDIC to use when calculating a bank's special assessment.

11. Nevertheless, despite the June 2023 revision to the Original December 2022 Call Report to both correct the erroneous reporting and to reflect that the Intercompany Position was reduced to approximately $2 billion prior to December 31, 2022 due to the retroactive distribution, the FDIC included the Intercompany Position in its calculation of CONA's uninsured deposits, relying on a calculation of its own making rather than on the Revised December 2022 Call Report. According to the FDIC's erroneous calculation including the Intercompany Position, CONA's total special assessment is approximately $475 million, whereas the special assessment properly calculated based on the Revised December 2022 Call Report, is approximately $325 million.

12. On July 8, 2025, the FDIC invoiced CONA for approximately $84 million more than what CONA actually owed for its special assessment on its quarterly invoice. CONA expects subsequent invoices based on the Intercompany Position to total approximately $76 million plus interest. In total, the FDIC has estimated that CONA will owe approximately $149 million more than what it should for its special assessment across the whole special assessment period.

13. In a series of communications with the FDIC spanning the past two years, CONA has demonstrated that the Intercompany Position has been wrongly included in the invoiced special assessment amount and that the invoice is therefore incorrect. The FDIC nonetheless persists in seeking to collect a special assessment based on its erroneous calculation. Despite CONA's attempts to resolve this dispute, on September 8, 2025, the FDIC communicated that it disagreed with CONA's treatment of the Intercompany Position and that, at this point, CONA could either pursue an administrative appeal with the FDIC or litigate the issue in court.

14. As a result of this dispute, CONA has also been required to deposit security equaling the full invoiced amount in dispute (approximately $85 million) in satisfaction of the erroneous invoice to avoid penalties under the FDIA. *See* 12 U.S.C. § 1828. CONA posted this security deposit in full on or about September 10, 2025. CONA will continue to be required to post additional security as subsequent invoices become due, along with accruing interest, until this dispute is resolved.

15. At this time, this dispute is at an impasse requiring this Court's neutral adjudication. CONA therefore brings this action for a declaratory judgment pursuant to 28 U.S.C. § 2201, seeking a declaration that the FDIC erroneously included the Intercompany Position in its calculation of CONA's special assessment, violated its own Special Assessment Rule in doing so, and cannot recover the amount of the assessment attributable to the Intercompany Position as an unpaid assessment lawfully payable pursuant to 12 U.S.C. § 1817(g).

## THE PARTIES

16. Plaintiff, CONA, is a national banking association whose principal place of business is 1680 Capital One Drive, McLean, Virginia, 22101-3407. CONA offers banking products and financial services to consumers, small businesses and commercial clients. CONA is the wholly owned and principal operating subsidiary of Capital One Financial Corporation ("COFC"). The Office of the Comptroller of the Currency ("OCC") is CONA's principal supervisor. The Federal Reserve is the principal supervisor of COFC.

17. Defendant, the FDIC, is an independent agency of the United States. The FDIC insures deposits of insured depository institutions and manages receiverships.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the cause of action arises under the FDIA, 12 U.S.C. § 1811 et seq.; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because CONA resides in McLean, Virginia.

## FACTUAL BACKGROUND

### Capital One Funding, LLC

20. CONA is a national banking association, and one of its principal activities is credit card lending to consumers and small businesses. As part of its lending business, CONA offers credit cards and may securitize the receivables that are generated.

21. Funding was organized as a limited liability company in 2001 and is a special purpose vehicle created for the sole purpose of supporting CONA's credit card securitization activities.

22. CONA and Funding's credit card securitization activities involve Funding purchasing credit card receivables originated by CONA (i.e., credit card debts owed to CONA by its cardholders). Funding then transfers the receivables to a securitization trust and, in exchange, receives a transferor interest in the trust portfolio. A portion of the receivables are then securitized into notes and sold to investors. Funding receives the net proceeds from the sale of these notes.

23. As a special purpose limited liability company, Funding is a separate legal entity from CONA. Pursuant to Funding's governing documents, Funding was created exclusively to engage in credit card securitization activities and has engaged solely in such activities since its creation.

24. Prior to October 1, 2022, Funding was a wholly owned subsidiary of Capital One Bank (USA), National Association ("COBNA"). Before that, it was a wholly owned subsidiary of COBNA's predecessor, Capital One Bank. Like CONA, each of COBNA and Capital One Bank was a wholly owned subsidiary of COFC that engaged in credit card servicing and credit card securitization.[4]

25. On October 1, 2022, COBNA merged with and into CONA, and Funding became a wholly owned subsidiary of CONA.

26. In addition to Funding, CONA has an analogous wholly owed special purpose vehicle, COAR. COAR is a special purpose vehicle created for the sole purpose of supporting CONA's auto loan securitization activities.

## The Intercompany Position

27. Funding entered into a credit agreement with Capital One Bank on August 1, 2002, to facilitate the financing of Funding's purchases of Capital One Bank's credit card receivables.

28. Funding's purchases of the credit card receivables from Capital One Bank, as well as the funds advanced by Capital One Bank to Funding pursuant to the credit agreement to finance those purchases and Funding's repayment of those advances, were reflected as a book-entry position that Funding maintained with Capital One Bank, which is the Intercompany Position. No cash was transferred between Capital One Bank and Funding in connection with such purchases, loan advances, and repayments.

29. Initially, Funding drew on the credit facility significantly to fund its purchases of credit card receivables, at times consisting of a negative position in excess of $10 billion. As a

---

[4] References to CONA include, if the context requires, COBNA and/or Capital One Bank, as its predecessor; references to each of Capital One Bank and COBNA include, if the context requires, CONA as its successor.

result, the book-entry position reflected a significant negative position for many years of Funding's existence.

30. Over time, as cardholders made payments on their credit card balances, Funding's negative position was reduced, eventually reaching the point where Funding accumulated a positive position reflected in its book-entry position.

31. Presently, as CONA's cardholders make payments on their credit card balances, CONA, as servicer of the credit cards pursuant to a Pooling and Servicing Agreement with Funding, collects, allocates, and distributes those payments. Funding, as holder of the transferor interest, is entitled to a significant portion of those payments, which are credited directly to CONA's Federal Reserve master account, with a corresponding positive adjustment to Funding's book-entry position.

32. The remainder of those payments are then first paid out to investors in the securitized credit card receivables notes issued by the securitization trust via a payment waterfall, and the remaining amounts are then ultimately swept back up to CONA's Federal Reserve master account, again, with a corresponding positive adjustment to Funding's book-entry position.

33. Funding has very little discretion in what it can do with the Intercompany Position as it is limited by its governing documents to use its funds in support of CONA's credit card securitization activities. In addition, the Intercompany Position lacks many of the typical characteristics of a deposit account. For example, no unique account number was ever assigned, no checks or drafts were issued to Funding, and no wires or Automated Clearing House payments could be sent or received by Funding through the Intercompany Position. This is despite the fact that Funding had a Money Market Deposit Account ("MMDA") agreement with COBNA.

**The December 2022 Call Report**

34. In February 2023, CONA filed the Original December 2022 Call Report with the FDIC.

35. On the Schedule RC-O in the Original December 2022 Call Report,[5] CONA erroneously included the Intercompany Position on Memorandum Item 1 "Total deposit liabilities" and Line 2 for "Estimated amount of uninsured deposits." CONA did the same in the next quarter's Call Report in March 2023 (the "Original March 2023 Call Report"). The erroneous inclusion did not have any impact on CONA's regular quarterly assessments for December 2022 or March 2023.

36. The Original December 2022 Call Report was the first time the Intercompany Position was reported as an uninsured deposit on a Call Report since Funding's inception in 2001, even though a positive Intercompany Position had existed since at least 2013.

**Call Report Revision**

37. After the Original December 2022 Call Report was filed in February 2023, CONA initiated a review of its reporting on Schedule RC-O of CONA's Call Reports. At the time, there was increased industry focus on the reliance by banks on uninsured deposits because of the SVB and Signature failures.

38. As part of its review, CONA identified the Intercompany Position as incorrectly reported, because it did not meet the statutory definition of "deposit" under 12 U.S.C. § 1813(*l*). Therefore, it had been incorrectly reported as an uninsured deposit in the Original December 2022 Call Report and the Original March 2023 Call Report and both Call Reports would need to be revised.

5 The Schedule RC-O is a section of the Call Report where banks report "other data for deposit insurance and FICO assessments."

39. Funding also determined that the Intercompany Position was available to be retroactively distributed from Funding to CONA, which likewise would require that the Call Reports be revised and filed again.

40. On June 23, 2023, Funding declared two distributions to CONA. One was effective as of the date of the COBNA-CONA merger, October 1, 2022, and constituted approximately $54 billion of the Intercompany Position. The other was effective as of June 23, 2023, and constituted approximately $2 billion of the Intercompany Position.

41. On June 29, 2023, and July 3, 2023, CONA filed the Revised December 2022 Call Report and a revised March 2023 Call Report (the "Revised March 2023 Call Report"), respectively, to correct the erroneous inclusion of the Intercompany Position as an uninsured deposit on the Call Reports' Schedule RC-O and to reflect that the Intercompany Position was reduced to approximately $2 billion prior to December 31, 2022 following the retroactive distribution.

42. On July 7, 2023, CONA informed the FDIC, the OCC, and the Federal Reserve of the distributions and provided documentation in support of the filing of the Revised December 2022 Call Report and Revised March 2023 Call Report to update the Schedule RC-O items for "Total deposit liabilities" and "Estimated amount of uninsured deposits."

43. On September 29, 2023, the FDIC (but not the OCC nor the Federal Reserve) informed CONA that it disagreed with CONA's treatment of the Intercompany Position on the Revised December 2022 Call Report and Revised March 2023 Call Report. Since then, CONA has engaged in continued correspondence with the FDIC to attempt to resolve this issue, including a November 8, 2023 meeting with the FDIC where CONA presented its prior and current reporting

treatment of the Intercompany Position and its explanation for why it is not a deposit under 12 U.S.C. § 1813(*l*).

**SVB and Signature Closures**

44. In March 2023, SVB and Signature experienced rapid runs on their deposits and the banks were closed by their state regulators on March 10 and 12, 2023, respectively.

45. On March 10 and 12, 2023, the FDIC was appointed receiver of SVB and Signature, respectively.

46. On March 12, 2023, the Secretary of the Treasury invoked the statutory systemic risk exception to allow the FDIC to protect the uninsured depositors, in addition to the insured depositors, at SVB and Signature. *See* 12 U.S.C. § 1823(c)(4)(G).

**The Special Assessment Rule**

47. In November 2023, the FDIC adopted the Special Assessment Rule to recover the loss to the DIF resulting from the FDIC's protection of uninsured depositors following the closures of SVB and Signature. *See* 12 C.F.R. § 327.13.

48. According to the Special Assessment Rule, a bank's special assessment would be calculated by multiplying a special assessment rate by the bank's "uninsured deposits," subject to certain adjustments.

49. The Special Assessment Rule defines "uninsured deposits" as, in relevant part, a bank's uninsured deposits as reported in the Call Report for the quarter ended December 31, 2022 reported as of the later of (1) November 2, 2023, or (2) "[t]he date of the institution's most recent amendment to its Call Report … for the quarter ended December 31, 2022, if such amendment

arises from, or is confirmed through, the FDIC's Assessment Reporting Review."[6] 12 C.F.R. § 327.13(f).

50. In June 2024, the FDIC provided CONA with its Assessment Reporting Review findings and requested that CONA amend its Revised December 2022 Call Report to reflect the Intercompany Position as an uninsured deposit.

51. CONA did not amend its Revised December 2022 Call Report pursuant to the FDIC's Assessment Reporting Review findings or requests.

52. In July 2024, CONA sent the FDIC a letter presenting its reasons why its Revised December 2022 Call Report should not be amended to reflect the Intercompany Position. It explained that the Intercompany Position fails to meet the statutory definition of "deposit" as defined in 12 U.S.C. § 1813(*l*). It also described, among other reasons, the ways in which Funding is limited in its activities and does not control the Intercompany Position in the form of a typical deposit relationship, and that nearly all of the Intercompany Position was lawfully distributed as of October 1, 2022.

53. Because CONA did not amend its Revised December 2022 Call Report, CONA expected its uninsured deposits to be calculated based on its Revised December 2022 Call Report, filed on June 29, 2023. The FDIC's first four quarterly special assessment invoices, starting in the first quarter of 2024, were calculated based on the Revised December 2022 Call Report. However, on June 9, 2025, the FDIC informed CONA that it would soon receive an invoice for the special

---

6 The Special Assessment Rule preamble states that "as part of the FDIC's Assessment Reporting Review of an institution's reporting methodology," the FDIC may find that "as of November 2, 2023, an institution was not reporting uninsured deposits for the December 31, 2022, reporting period in accordance with the Call Report instructions[.]" 88 Fed. Reg. 83337.

assessment, and the invoice would reflect an increase from the Revised December 2022 Call Report, attributable, in large part, to the Intercompany Position.

54. On June 12, 2025, CONA communicated to the FDIC that it intended to pay its special assessment consistent with its Revised December 2022 Call Report.

**The Invoice**

55. On June 13, 2025, the FDIC invoiced CONA for the Insurance Coverage Period of First Quarter 2025 (the "Original Invoice").

56. On July 8, 2025, the FDIC transmitted an amended invoice (the "Superseding Invoice") that superseded the Original Invoice.[7]

57. The Superseding Invoice stated that CONA's "special assessment base and amount includes $56 billion attributable to Capital One Funding LLC's intercompany deposit[.]"

58. The Special Assessment Worksheet listed CONA's December 31, 2022 "Estimated Uninsured Deposits" as $161,669,157,000.00 and CONA's "Estimated Total Special Assessment Amount" as $474,080,869.06.

59. CONA disputes the accuracy of the amounts on the Superseding Invoice's Special Assessment Worksheet for the reasons outlined in the preceding paragraphs.

60. On July 23, 2025, to request revision of the Superseding Invoice, CONA submitted an amended invoice (the "CONA Amended Invoice") with a cover letter to the FDIC.

61. The letter stated that "the special assessment base and resulting calculations presented on the Superseding Invoice remain inconsistent with CONA's December 2022 Call Report."

[7] The amendments to the invoice reflect the FDIC's correction of mathematical errors that do not bear on the allegations in this Complaint nor the dispute between the parties.

62. In the CONA Amended Invoice, CONA annotated the Special Assessment Worksheet to the Superseding Invoice to exclude the Intercompany Position from the calculations, so that it was consistent with the Revised December 2022 Call Report.

63. The annotations in the CONA Amended Invoice reflect the December 31, 2022 "Estimated Uninsured Deposits" as $112,350,126,000.00 (compared to the Superseding Invoice's $161,669,157,000.00) and CONA's "Estimated Total Special Assessment Amount" as $324,841,481.28 (compared to the Superseding Invoice's $474,080,869.06).

64. The amount of CONA's uninsured deposits based on the Revised December 2022 Call Report is approximately $49 billion less than the amount listed on the Superseding Invoice.

65. The amount of CONA's "Total Special Assessment" calculated using the uninsured deposits amount on the Revised December 2022 Call Report is approximately $149 million less than the "Total Special Assessment" amount charged on the Superseding Invoice.

66. On or about June 27, 2025, CONA wired payment to the FDIC in satisfaction of the Superseding Invoice.

67. The FDIC asserts CONA failed to pay the full amount of its assessment and is subject to a penalty for every day of non-payment.

68. To avoid improper penalties, on or about September 10, 2025, CONA deposited security in full satisfaction of the invoiced amount the FDIC asserts CONA owes and CONA will continue to post additional security as subsequent invoices become due, along with accruing interest, while the issue remains in dispute.

**COUNT 1 – DECLARATORY JUDGMENT**

69. Pursuant to the Special Assessment Rule, CONA's special assessment should be determined based on the amount of uninsured deposits reported on its Revised December 2022 Call Report, which did not include the Intercompany Position. *See* 12 C.F.R. § 327.13.

70. Contrary to the Special Assessment Rule, in determining CONA's special assessment base, the FDIC did not use the uninsured deposit amount reported on CONA's Revised December 2022 Call Report. Instead, in its calculation, the FDIC included the Intercompany Position, which was not on CONA's Revised December 2022 Call Report.

71. The FDIC asserts the Intercompany Position is properly included because it meets the statutory definition of an uninsured deposit, and the retroactive distribution had no effect on the amount CONA owes. CONA disagrees.

72. A bona fide, justiciable case or controversy exists among the parties with respect to (1) the FDIC's calculation of CONA's special assessment and inclusion of the Intercompany Position, (2) whether the Intercompany Position meets the statutory definition of "deposit," and (3) whether CONA owes the FDIC an unpaid assessment.

73. The parties' dispute is actual, definite, substantial and sufficiently matured, and the issues alleged herein are ripe for judicial determination.

74. A declaratory judgment will resolve the parties' dispute going forward, save the parties substantial future costs and expense, and conserve judicial resources.

75. There is present, rather than hypothetical, contingent, or remote prejudice to CONA requiring the issuance of the declaratory relief sought herein.

## PRAYER FOR RELIEF

**WHEREFORE**, CONA respectfully requests that the Court enter judgment against the FDIC as follows:

1. Declaring that the Intercompany Position is not a deposit under 12 U.S.C. §1813(*l*);

2. Declaring that the Intercompany Position is not a deposit subject to the Special Assessment Rule;

3. Declaring that the FDIC's special assessment calculation on the Superseding Invoice improperly included the Intercompany Position;

4. Declaring that CONA has no unpaid assessment arising from the Superseding Invoice; and

5. Granting such other relief as the Court may deem just and proper.

Dated: September 10, 2025

Respectfully submitted,

CAPITAL ONE, N.A., *by counsel*,

/s/ John S. Moran
John S. Moran (VA Bar #84236)
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 828-2817
Fax: (202) 828-3327
*jmoran@mcguirewoods.com*

Bryan A. Fratkin (VA Bar #38933)
Juliet B. Clark (VA Bar #96918)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
Phone: (804) 775-4352
Fax: (804) 698-2100
*bfratkin@mcguirewoods.com*
*jbclark@mcguirewoods.com*

John Gleeson*
Helen V. Cantwell*
Elliot Greenfield*
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

* Applications for admission *pro hac vice* forthcoming