**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CAPITAL ONE, NATIONAL ASSOCIATION,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **Case No. 1:25-cv-1515-RDA-LRV**<br><br>**Jury Trial Demanded** |

**FEDERAL DEPOSIT INSURANCE CORPORATION'S**
**COUNTERCLAIM AND ANSWER TO COMPLAINT**

## COUNTERCLAIM

Defendant and Counterclaim-Plaintiff Federal Deposit Insurance Corporation ("FDIC") hereby alleges for its Counterclaims against Capital One, National Association ("CONA") as follows:

## PRELIMINARY STATEMENT

1. The FDIC seeks relief from this Court because CONA refuses to pay the full amount of the special assessments that CONA owes to the FDIC. As of the date of this filing, CONA has paid only part of its special assessments and has withheld payment of $99,427,166.46 that is due and owing, together with interest.

2. CONA is withholding payment because it claims that funds of one of its subsidiaries that were in an account at the bank on the date relevant to the special assessment are not subject to the special assessment. CONA and the subsidiary identified these approximately

$56 billion in funds as deposits at the time, and the subsidiary received the benefit of FDIC deposit insurance on these funds up to applicable limits. Nevertheless, CONA now claims that these funds should not be counted as deposits for purposes of calculating CONA's special assessments. As described in more detail below, after the FDIC issued a notice of proposed rulemaking under which those deposits would be used in calculating CONA's special assessments, CONA claims that its subsidiary went back in time more than half a year and retroactively distributed most of those funds to CONA so, CONA argues, they no longer existed in the account on the relevant date for the special assessment. CONA also now claims that the funds were never "deposits" as that term is defined in the Federal Deposit Insurance ("FDI") Act. These arguments are simply wrong. There are no time machines when it comes to special assessments, and the subsidiary's funds were deposits held at the bank for which the subsidiary already received the benefit of FDIC deposit insurance.

## THE PARTIES

3. The FDIC is an agency of the United States responsible for insuring deposits; examining and supervising financial institutions for safety, soundness, and consumer protection; making large and complex financial institutions resolvable; and managing receiverships. The FDIC brings these counterclaims in its corporate capacity. As of November 7, 2025, the FDIC provides deposit insurance to 4,376 banks and savings associations. It also directly examines and supervises more than 2,800 banks and savings associations for operational safety and soundness.

4. Plaintiff and Counterclaim-Defendant CONA is a national banking association whose principal place of business is 1680 Capital One Drive, McLean, Virginia, 22101-3407.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 12 U.S.C. § 1819, 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over CONA, which at all relevant times conducted business in the Eastern District of Virginia.

7. Venue is proper pursuant to 28 U.S.C. § 1391 because CONA resides in the Eastern District of Virginia, having its principal place of business within the District.

## FACTUAL ALLEGATIONS

### I. The FDIC Provides Deposit Insurance

8. The FDIC's mission is to maintain stability and public confidence in the nation's banking system. The FDIC administers the Deposit Insurance Fund ("DIF"), which insures deposits up to $250,000 per depositor, per ownership category at each FDIC-insured bank. If an institution fails, the FDIC ensures that the institution's depositors have timely access to their insured deposits. Ultimately, if the assets of the failed institution are insufficient to return all insured deposits in full, the FDIC pays the shortfall from the DIF. Since the FDIC was established in 1933, no depositor has lost a single cent of FDIC-insured funds. This insurance gives depositors confidence that the insured money they deposit with thousands of FDIC-insured institutions across the country is safe.

9. The DIF was established pursuant to the FDI Act, 12 U.S.C. §§ 1811 *et seq*. Under Section 7 of the FDI Act, 12 U.S.C. § 1817, the FDIC is required to establish, by regulation, a risk-based assessment system. The FDIC's assessment system is risk-based so that riskier institutions—*i.e.*, institutions that are more likely to cause a loss to the DIF—pay higher rates for deposit insurance than safer institutions.

10. The FDIC determines an institution's risk profile—and thus the rates that are used in calculating an institution's assessments—using financial information that the institution self-reports and self-certifies. Because the FDIC relies on an institution's reporting of its own financial information, it is legally required and imperative that the institution truthfully report the information used to calculate its assessments. 12 U.S.C. § 1817(c).

## II. CONA Benefits from FDIC Deposit Insurance

11. The DIF safeguards hundreds of billions of dollars for CONA's depositors. As of December 31, 2024, CONA held approximately $362 billion in domestic deposits—of which an estimated $297.8 billion were insured deposits. This deposit insurance is exceedingly valuable to CONA, as it helps CONA keep its existing customers and recruit new customers.

12. CONA's deposits are its lifeblood, so it is a significant beneficiary of this system of deposit insurance. CONA has described itself publicly as being "one of the nation's largest banks based on deposits as of December 31, 2024."

13. Deposit insurance affords CONA the benefit of being able to offer customers deposit accounts that are insured against loss in the event of failure. This allows CONA to attract new customers and keep existing ones. The security of having deposits insured also helps CONA prevent a "bank run," during which a panic about CONA's solvency could lead to queues of people seeking to withdraw their money.

## III. Banks Certify the Accuracy of their Call Reports

14. As required by the FDI Act, the FDIC funds the DIF with risk-based assessments collected from FDIC-insured institutions.

15. To assess the risk each institution poses to the DIF, the FDIC uses financial information that is self-reported and self-certified by each insured institution. Each quarter, every insured institution files a Consolidated Report of Condition and Income, or "Call Report."

16. One component of a Call Report is Schedule RC-O,[1] where institutions are required to report their total deposits and the total amount of their estimated uninsured deposits along with other information. An uninsured deposit is the amount of any deposit of any depositor at an insured depository institution that exceeds the FDIC insurance limit, which currently is $250,000 per depositor, per ownership category. The FDIC is required by statute to collect information on the total amount of uninsured deposits held by financial institutions. 12 U.S.C. § 1817(a)(9)(B).

17. The FDIC relies upon the data each institution submits in the Call Report. By statute, each Call Report must contain two certifications as to its accuracy. First, the Call Report "shall contain a declaration by the president . . . or by any other officer designated by the board of directors or trustees of the reporting depository institution to make such declaration, that the report is true and correct to the best of his knowledge and belief," 12 U.S.C. § 1817(a)(3). Second, "[t]he correctness of said report of condition shall be attested by the signatures of at least two directors or trustees of the reporting depository institution other than the officer making such declaration." *Id.*

## IV. The FDIC Implements a Special Assessment to Replenish the DIF

18. In March 2023, two large regional banks—Signature Bank, of New York ("Signature"), and Silicon Valley Bank, of California ("SVB")—were closed by their respective regulators and the FDIC was appointed receiver for both failed institutions. Prior to failure, both Signature and SVB held large amounts of uninsured deposits—deposit accounts with balances in excess of the $250,000 limit for FDIC insurance. By law, uninsured deposits ordinarily are

[1] Schedule RC-O is a schedule on the Call Report used to determine deposit insurance and FICO assessments. *See* SCHEDULE RC-O – OTHER DATA FOR DEPOSIT INSURANCE AND FICO ASSESSMENTS, www. fdic.gov/system/files/2024-08/2011-03-rc-o.pdf.

ineligible for FDIC insurance coverage in the event the bank holding those deposits is placed in receivership.

19. On March 12, 2023, the Department of the Treasury, Board of Governors of the Federal Reserve System, and the FDIC announced the approval of systemic risk exceptions for the SVB and Signature failures—meaning that that the failures would be expected to have serious adverse effects on economic conditions or financial stability. Pursuant to the systemic risk exceptions, depositors of SVB and Signature, including those with uninsured deposits, were protected. The March 12, 2023, announcement explained that "[a]ny losses to the Deposit Insurance Fund to support uninsured depositors will be recovered by a special assessment on banks, as required by law." The statutory requirement that losses to the DIF from invocation of systemic risk exceptions be recovered by special assessments is codified at 12 U.S.C. § 1823(c)(4)(G)(ii) (Repayment of loss).

20. On May 11, 2023, as required by statute, the FDIC published a notice of proposed rulemaking ("NPR") that explained that the contemplated rule would implement a special assessment to recover the losses to the DIF associated with protecting uninsured depositors following the closures of SVB and Signature. The NPR further explained that "[t]he assessment base for the special assessment would be equal to an insured depository institution's (IDI's) estimated uninsured deposits reported [on its Call Report] as of December 31, 2022, adjusted to exclude the first $5 billion." 88 Fed. Reg. 32,694 (May 22, 2023).

21. On November 16, 2023, the FDIC adopted a final rule implementing a special assessment to recover the loss to the DIF associated with protecting uninsured depositors following the closures of Signature and SVB ("Final Special Assessment Rule"). 88 Fed. Reg.

83,329. The FDI Act required the FDIC to take this action. 12 U.S.C. § 1823(c)(4)(G)(iii) ("The Corporation shall prescribe such regulations as it deems necessary to implement this clause.").

22. As required by the statute, the Final Special Assessment Rule imposes the special assessment on the banks that benefited most from the assistance provided under the systemic risk determinations for Signature and SVB. The FDIC determined that, in general, large banks and regional banks, and particularly those with large amounts of uninsured deposits, were the banks most vulnerable to uninsured deposit runs and benefited most from the stability provided under the systemic risk determinations.

23. Under the Final Special Assessment Rule, a bank's quarterly special assessment amount is calculated by multiplying its special assessment base by the quarterly special assessment rate. The quarterly special assessment rate is the same for all insured institutions subject to the special assessment.

24. A bank's special assessment base is equal to its estimated uninsured deposits reported on Schedule RC-O of its Consolidated Reports of Condition and Income as of December 31, 2022 ("2022 Call Report") (the quarter preceding the failures of SVB and Signature), adjusted to exclude the first $5 billion of uninsured deposits.

## V. CONA Initially Reports Its Uninsured Deposits Correctly

25. Capital One Funding, LLC ("Funding"), is a wholly owned subsidiary of CONA. Funding was organized as a limited liability company in 2001. Prior to October 1, 2022, Funding was a wholly owned subsidiary of Capital One Bank (USA), National Association ("COBNA"). Before that, it was a wholly owned subsidiary of COBNA's predecessor, Capital One Bank. On October 1, 2022, COBNA merged with CONA, at which point Funding became a wholly owned subsidiary of CONA.

26. Upon information and belief, Funding was created to facilitate CONA's credit card securitization activities. Specifically, and according to CONA's complaint, Funding purchases credit card receivables originated by CONA (*i.e.*, credit card debts owed to CONA by its cardholders) and then transfers those receivables to a securitization trust in exchange for a transferor interest in the trust portfolio. The complaint alleges that a portion of the receivables are then indirectly securitized into notes and sold to investors, whereupon Funding receives the net proceeds from the sale of these notes.

27. Prior to its merger with CONA, COBNA and Funding entered into an Intercompany Money Market Deposit Account Agreement (the "MMDA Agreement") dated as of November 20, 2013. CONA succeeded to COBNA's interests under the MMDA Agreement when the two institutions merged on October 1, 2022. The second recital in the MMDA Agreement explains that "Funding intends to open a money market deposit account . . . with [CONA] to make deposits and withdrawals."

28. Paragraph 4 of the MMDA Agreement states, in pertinent part, that "[t]he MMDA will bear, accrue and compound interest, calculated in accordance with the attached MMDA Terms, except as provided herein otherwise." In accordance with the MMDA Agreement, CONA paid interest on Funding's account balance.

29. Paragraph 5 of the MMDA Agreement states: "The MMDA is insured by the Federal Deposit Insurance Corporation to the maximum allowed by applicable law, and is not otherwise insured or guaranteed by COBNA, the United States Government or any agency thereof."

30. As of December 31, 2022, Funding's MMDA held approximately $56 billion in deposits (the "Intercompany Deposit"). Of this amount, $250,000 was protected by the deposit insurance that the FDIC provides, and the remainder was an uninsured deposit.

31. In accordance with the Call Report instructions, when CONA first filed its 2022 Call Report, CONA included the Intercompany Deposit in Memorandum Item 1 — "Total deposit liabilities" on Schedule RC-O of its 2022 Call Report. In addition, CONA included Funding's MMDA balance, less the $250,000 insured portion, on Line 2 — "Estimated amount of uninsured deposits" of Schedule RC-O.

32. On April 28, 2023, CONA continued to report the Intercompany Deposit correctly on its Call Report as of March 31, 2023 (the "Q1 2023 Call Report").

**VI. CONA Amends Its Call Reports to Exclude the $56 Billion Intercompany Deposit**

33. SVB and Signature failed in March 2023. On May 11, 2023, the FDIC published its NPR announcing that—in compliance with 12 U.S.C. § 1823(c)(4)(G)(ii)(I)—it would recover the losses sustained by the DIF through a special assessment based on the amount of uninsured deposits held by each bank as reported on the bank's 2022 Call Report.

34. Upon information and belief, CONA concluded from its review of the NPR that the bank would incur a sizeable special assessment based on the amount of uninsured deposits reported on Schedule RC-O of its 2022 Call Report, which included the approximately $56 billion Intercompany Deposit.

35. To avoid paying its fair share of the special assessment, on June 23, 2023, CONA declared a distribution of "nearly all" of the approximately $56 billion on deposit in Funding's account. Needless to say, a distribution that occurred in June 2023 would do nothing to reduce the amount of uninsured deposits reported on CONA's 2022 Call Report unless CONA somehow were able to turn back time. And that is precisely what CONA claims to have done. When it

declared the distribution on June 23, 2023, CONA also claimed that it was retroactive with an "effective date" of October 1, 2022, in the previous calendar year.

36. On June 29, 2023, one month after the FDIC announced in the NPR that the special assessment would be based on the amount of uninsured deposits reported on each bank's 2022 Call Report, CONA amended its 2022 Call Report by removing the $56 billion Intercompany Deposit from the total deposits and uninsured deposits reported on Schedule RC-O. This was based on the retroactive distribution and CONA's new position that—at least for deposit insurance assessment purposes—the Intercompany Deposit was no longer a "deposit," even though the MMDA Agreement identifies the account as holding deposits "insured by the Federal Deposit Insurance Corporation."

37. On July 7, 2023, CONA amended its Q1 2023 Call Report by, among other things, eliminating the Intercompany Deposit from the total deposits and total uninsured deposits that CONA reported on Schedule RC-O.

## VII. The FDIC Reminds Banks of Their Obligation to Report Uninsured Deposits Correctly

38. On July 24, 2023, the FDIC issued a Financial Institution Letter ("FIL") titled "Estimated Uninsured Deposits Reporting Expectations."

39. The FDIC explained in the FIL that the agency had observed that, following the May 11, 2023 NPR, some banks were not reporting their estimated uninsured deposits in accordance with the Call Report instructions.

40. The FDIC specifically noted in the FIL that "some institutions incorrectly reduced the amount reported on Schedule RC-O by excluding intercompany deposit balances of subsidiaries." The Call Report Instructions, which were explained in the FIL, require that all

deposits of subsidiaries "that are consolidated, and therefore eliminated from reported deposits on a bank's balance sheet, must be reported in Schedule RC-O."[2]

41. Upon information and belief, CONA reviewed the FIL shortly after the FDIC distributed it.

**VIII. CONA Refuses to Pay What It Owes**

42. Every Call Report that CONA submitted for the fourth quarter of 2022 through the most recent quarter was certified by CONA as true and correct pursuant to 12 U.S.C. § 1817(a)(3) even though CONA did not accurately report its uninsured deposits in the amended version of its 2022 Call Report, the amended version of its March 31, 2023 Call Report, or any of the Call Reports that CONA has submitted for subsequent quarters.

43. In February and March of 2024, the FDIC conducted a review of the figures that CONA reported on Schedule RC-O of its 2022 Call Report as part of an Assessment Reporting Review of 30 banks subject to the special assessment. By letter dated June 13, 2024, the FDIC informed CONA of the results of the Assessment Reporting Review. In particular, the FDIC advised CONA that its amended 2022 Call Report improperly excluded the $56 billion Intercompany Deposit from the total deposits and total uninsured deposits that CONA reported on Schedule RC-O. The FDIC directed CONA to further amend its 2022 Call Report to correct this and other errors identified in the FDIC's June 13, 2024 letter.

44. On the basis of CONA's originally filed 2022 Call Report, along with subsequent information provided, the FDIC issued an invoice to CONA dated June 13, 2025, showing that the bank's estimated total special assessment amount was $490,138,032.48.

---

[2] *See* Call Report Instructions, General Instructions, at p.12, *available at* https://www.fdic.gov/resources/bankers/call-reports/crinst-031-041/2022/2022-12-generalinstructions.pdf.

45. On July 8, 2025, the FDIC issued a corrected invoice, based on additional information supplied by CONA on June 27, updating CONA's estimated total special assessment amount to $474,080,869.06.

46. By letter dated July 23, 2025, CONA, through retained counsel, informed the FDIC that it disagreed with the estimated total assessment reflected in the corrected invoice dated July 8, 2025. Specifically, CONA asserted that, according to its calculations, based on the amended version of its 2022 Call Report, CONA's estimated total special assessment should be only $324,841,481.28.

47. CONA has refused to amend its 2022 Call Report, and its Call Reports for subsequent quarters, to include Funding's MMDA balance in the total deposits and total unsecured deposits reported on Schedule RC-O.

48. CONA also has refused to pay the full amount of its special assessment as invoiced by the FDIC. These invoices are past due.

49. All told, by underreporting its uninsured deposits, CONA is attempting to avoid approximately $99 million of its fair share of the special assessment, funds that CONA is required to pay.

## CAUSE OF ACTION

### Failure to Pay Mandatory Assessments as Required by 12 U.S.C. § 1817

50. The FDIC incorporates by reference each of the allegations set forth above.

51. CONA, in its amended 2022 Call Report, underreported its uninsured deposits by excluding the Intercompany Deposit.

52. The FDIC correctly calculated CONA's special assessment based on the data CONA provided to the FDIC in its 2022 Call Report as originally filed.

53. As a direct and proximate result of its underreporting, CONA is attempting to avoid special assessment fees representing approximately $99 million of the total amount that it owes.

54. On or about June 13, 2024 the FDIC invoiced CONA for its first payment of its portion of the special assessment.

55. On July 8, 2024, the FDIC sent CONA an updated invoice based on additional information supplied by CONA.

56. CONA received both the June 13, 2024, and July 8, 2024, invoices.

57. CONA failed to pay the full amount of the special assessment it owes.

58. To this day, CONA has not made full payment of the special assessment amounts invoiced through September 30, 2025.

59. In accordance with 12 U.S.C. § 1817(g), the FDIC is entitled by federal statute to recover the past due assessments owed by CONA.

**PRAYER FOR RELIEF**

WHEREFORE, the FDIC prays that final judgment be entered against CONA declaring, ordering, and adjudging that:

a. CONA violated the obligation imposed by 12 U.S.C. § 1817 and the Final Special Assessment Rule;

b. CONA underpaid for its FDIC deposit insurance;

c. CONA must pay the FDIC the full amount it owes, including interest, prejudgment interest, and costs of this action; and

d. such other relief is awarded to the FDIC as may be appropriate and as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC respectfully demands a trial by jury for all issues in this case that are so triable.

* * *

## ANSWER

The FDIC, by and through its undersigned counsel, hereby answers the Complaint ("Complaint") filed by CONA using numbered paragraphs that correspond to the numbered paragraphs in the Complaint.

The FDIC denies any allegations made in the unnumbered headings contained in the Complaint. The FDIC further denies each and every allegation set forth in the Complaint except for those allegations expressly and specifically admitted below.

## NATURE OF THE ACTION

1. The FDIC denies the allegations in Paragraph 1.

2. The FDIC admits the allegations in Paragraph 2.

3. The FDIC admits that SVB's and Signature's depositors were protected using funds from the DIF and that the FDIC took actions to protect these depositors. The FDIC denies the remainder of the allegations in the paragraph. The Secretary of the Treasury invoked the systemic risk exception acting on the recommendations of the FDIC Board and the Board of Governors and after consultation with the President.

4. The FDIC admits the allegations in Paragraph 4.

5. The FDIC admits in part and denies in part the allegations in Paragraph 5. The FDIC admits that 12 C.F.R. § 327.13(f) ("the Final Special Assessment Rule") calculates special assessments based on the estimated uninsured deposits as reported on a bank's December 31, 2022 Call Report, adjusted to exclude the first $5 billion in uninsured deposits. The FDIC further admits that in calculating the special assessment, if a bank files an amendment to its Call Report prior to November 2, 2023, or an amendment filed after that date but arising from or

confirmed through the FDIC's Assessment Reporting Review, the FDIC will calculate the special assessment based on that amendment. Call Reports and amendments to Call Reports are required to be accurate. To the extent that Paragraph 5 alleges that the Final Special Assessment Rule requires assessments to be based on a bank's Call Report if that Call Report is found to contain errors, the FDIC denies this allegation.

6. The FDIC admits in part and denies in part the allegations in Paragraph 6. The FDIC admits that in calculating CONA's uninsured deposits, it included approximately $56 billion in certain deposits attributable to CONA's wholly owned subsidiary Capital One Funding, LLC ("Funding"), a special purpose vehicle (the "Intercompany Deposit"). The Complaint alleges that the Intercompany Deposit also includes funds from Capital One Auto Receivables, LLC ("COAR"). The FDIC lacks sufficient information to form a belief as to the truth or falsity of allegations related to COAR and accordingly denies all allegations related to COAR. The FDIC further admits that the $56 billion Intercompany Deposit was included in Schedule RC-O on CONA's December 31, 2022 Call Report and later was excluded from Schedule RC-O on CONA's amended December 31, 2022 Call Report, which was identified as a significant error requiring CONA to file another amendment. As CONA did not file another amendment as directed, the FDIC calculated CONA's special assessment based on the corrected calculation of uninsured deposits.

7. The FDIC admits that CONA disputes that the Intercompany Deposit is subject to the Final Special Assessment Rule.

8. The FDIC denies the allegation in Paragraph 8.

9. The FDIC admits in part and denies in part the allegations in Paragraph 9. The FDIC admits that CONA's originally filed December 31, 2022 Call Report included the $56

billion Intercompany Deposit and that CONA subsequently amended that Call Report on June 29, 2023 to exclude it. The FDIC denies the remainder of the allegations in Paragraph 9.

10. The FDIC denies the allegations in Paragraph 10.

11. The FDIC admits in part and denies in part the allegations in Paragraph 11. The FDIC admits that the Intercompany Deposit was included in the calculation of CONA's uninsured deposits, resulting in a total special assessment of approximately $475 million. The FDIC further admits that the special assessment was not calculated based solely on CONA's June 2023 revision to its December 31, 2022 Call Report, which was determined to be inaccurate because it incorrectly excluded the Intercompany Deposit. The FDIC denies the remainder of the allegations in Paragraph 11.

12. The FDIC admits in part and denies in part the allegations in Paragraph 12. The FDIC admits that on July 8, 2025 the FDIC invoiced CONA for its quarterly special assessment and that CONA currently owes more than $99 million in special assessments attributable to the $56 billion Intercompany Deposit. The FDIC denies the remainder of the allegations in Paragraph 12.

13. The FDIC admits in part and denies in part the allegations in Paragraph 13. The FDIC admits that the FDIC and CONA have been engaged in conversation over the past two years and that the FDIC is seeking to collect the special assessment CONA owes. The FDIC further admits that on September 8, 2025, the FDIC communicated that it disagrees with CONA's treatment of the Intercompany Deposit and that the FDIC would permit CONA to access the internal administrative appeals process with the posting of collateral in lieu of actual payment as is typically required by 12 C.F.R. § 327.2(e). The FDIC denies the remainder of the allegations in Paragraph 13.

14. The FDIC admits in part and denies in part the allegations in Paragraph 14. The FDIC admits that pursuant to 12 C.F.R. § 327.2(e), CONA was required to pay the full amount of the invoice. The FDIC allowed CONA to deposit security in lieu of actual payment, and the FDIC admits that CONA posted a security deposit of approximately $85 million on September 10, 2025. The FDIC further admits that CONA will continue to be required to post additional security equal to the sum of subsequent invoices, along with accruing interest. The FDIC denies that the invoice was erroneous.

15. This paragraph contains a legal conclusion to which no response is required. To the extent that a response is required, the FDIC admits in part and denies in part the allegations in Paragraph 15. The FDIC admits that CONA is seeking a declaratory judgment and that the dispute is at an impasse but denies that a declaratory judgment action by CONA is appropriate in this case. The FDIC similarly denies the remainder of the allegations in Paragraph 15.

## THE PARTIES

16. The FDIC admits the allegations in Paragraph 16.

17. The FDIC admits the allegations in Paragraph 17.

## JURISDICTION AND VENUE

18. Paragraph 18 sets forth legal conclusions and does not require a response, but, to the extent a response is required, the FDIC denies the allegations of this Paragraph.

19. Paragraph 19 sets forth legal conclusions and does not require a response, but, to the extent a response is required, the FDIC admits the allegation of this Paragraph.

## FACTUAL BACKGROUND

### Capital One Funding, LLC

20. The FDIC admits the allegations in Paragraph 20.

21. Upon information and belief, the FDIC admits the allegations in Paragraph 21.

22. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22 and therefore denies those allegations.

23. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and therefore denies those allegations.

24. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and therefore denies those allegations.

25. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and therefore denies those allegations.

26. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 and therefore denies those allegations.

**The Intercompany Position**

27. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and therefore denies those allegations.

28. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28 and therefore denies those allegations.

29. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29 and therefore denies those allegations.

30. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30 and therefore denies those allegations.

31. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31 and therefore denies those allegations.

32. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and therefore denies those allegations.

33. The FDIC admits in part and in part lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33. The FDIC admits that Funding had a Money Market Deposit Account ("MMDA") agreement with COBNA. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 33 and therefore denies those allegations.

**The December 2022 Call Report**

34. The FDIC admits the allegation in Paragraph 34.

35. The FDIC admits that CONA included the Intercompany Deposit in the Original Call Reports filed for December 2022 and March 2023, and that this inclusion impacted CONA's special assessments but not its regular quarterly assessments. The FDIC denies that the inclusion of the Intercompany Deposit was "erroneous" and denies the remainder of the allegations in this Paragraph.

36. The FDIC lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 36 and therefore denies those allegations.

**Call Report Revision**

37. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 37, except it admits that there was increased industry focus on uninsured deposits in the wake of the SVB and Signature failures.

38. The FDIC denies the allegations in Paragraph 38.

39. The FDIC denies the allegations in Paragraph 39.

40. The FDIC lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 40, except it admits that on June 23, 2023, Funding claimed to have retroactively declared an approximately $54 billion distribution to CONA.

41. The FDIC denies the allegations in Paragraph 41, except it admits that on June 29, 2023, and July 3, 2023, CONA filed amendments to the bank's December 2022 and March 2023 Call Reports.

42. The FDIC denies the allegations in Paragraph 42, except it admits that on July 7, 2023, CONA informed the FDIC, OCC, and the Federal Reserve that it had amended its December 2022 and March 2023 Call Reports based on distributions declared in June 2023 that purportedly were made retroactive to October 2022. The FDIC further admits that CONA supplied some documentation that purported to justify the Call Report amendments.

43. The FDIC admits in part, denies in part, and in part lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43. The FDIC admits that on September 29, 2023, the FDIC informed CONA by email that it disagreed with CONA's exclusion of the Intercompany Deposit on the amended Call Reports, and that the FDIC and CONA have communicated back and forth since then, including a November 8, 2023 meeting. The FDIC denies that the Intercompany Deposit is not a deposit under 12 U.S.C. § 1813(l). The FDIC lacks knowledge or information sufficient to form a belief as to the remainder of the allegations in this Paragraph and therefore denies those allegations.

**SVB and Signature Closures**

44. The FDIC admits the allegations in Paragraph 44.

45. The FDIC admits the allegations in Paragraph 45.

46. The FDIC admits the allegations in Paragraph 46.

**The Special Assessment Rule**

47. The FDIC admits the allegations in Paragraph 47.

48. The FDIC admits the allegations in Paragraph 48.

49. Paragraph 49 recites portions of the Final Special Assessment Rule. The FDIC responds that the Final Special Assessment Rule speaks for itself and otherwise denies the allegations of Paragraph 49.

50. The FDIC admits the allegations in Paragraph 50.

51. The FDIC admits the allegations in Paragraph 51.

52. The FDIC denies the allegations of Paragraph 52, except it admits that, in July 2024, CONA sent the FDIC a letter presenting its arguments for why its amended December 2022 Call Report should not be amended again. CONA's letter speaks for itself.

53. The FDIC admits in part and in part lacks knowledge or information as to the truth of the allegations in Paragraph 53. The FDIC admits that CONA's first four quarterly special assessment invoices were calculated based on CONA's amended December 2022 Call Report, which was determined to contain errors requiring another amendment. The FDIC further admits that on June 9, 2025, the FDIC again informed CONA that the exclusion of the $56 billion Intercompany Deposit from the uninsured deposits on the December 2022 Call Report was an error requiring further amendment, and that CONA should expect an invoice reflecting an increase attributable in large part to the Intercompany Deposit. The FDIC lacks knowledge or information sufficient to determine what CONA expected but notes that CONA was informed at least twice prior to the communication on June 9, 2025, that it would need to correct errors on its amended Call Report.

54. The FDIC admits the allegations in Paragraph 54.

**The Invoice**

55. The FDIC admits the allegations in Paragraph 55.

56. The FDIC admits the allegations in Paragraph 56.

57. The FDIC admits the allegations in Paragraph 57.

58. The FDIC admits the allegations in Paragraph 58.

59. The FDIC admits that CONA is disputing the accuracy of the Special Assessment Worksheet included in the July 8, 2025 invoice but denies that CONA has a legitimate basis for that dispute.

60. The FDIC admits that CONA edited the invoice it received from the FDIC with its own calculations and sent that edited invoice to the FDIC on July 23, 2025, along with a cover letter (the "Self-Edited invoice").

61. Paragraph 61 recites language from a letter that CONA sent to the FDIC. The letter speaks for itself.

62. The FDIC admits that CONA excluded the Intercompany Deposit from its calculations in the Self-Edited Invoice. The FDIC further admits that this erroneous exclusion matches CONA's inaccurately amended December 2022 Call Report.

63. The FDIC admits that CONA self-edited the July 8, 2025 invoice as alleged in Paragraph 63, and that these amounts match CONA's inaccurately amended December 2022 Call Report.

64. The FDIC admits that CONA's inaccurately amended December 2022 Call Report lists uninsured deposits $49 billion less than the amount listed on the July 8, 2025 invoice.

65. The FDIC admits that the amount of the special assessment calculated by CONA based on its improperly amended December 2022 Call Report is approximately $149 million less than the amount of the special assessment reflected on the FDIC's July 8, 2025 invoice.

66. The FDIC denies the allegations in Paragraph 66, except it admits that, on June 27, 2025, CONA wired funds to the FDIC in partial satisfaction of its special assessment liability.

67. The FDIC denies the allegations in Paragraph 67, except it admits that it has informed CONA that the bank has failed to pay the full amount of its special assessment, and admits that failure to timely pay assessments may be subject to penalties under the FDI Act and the FDIC's regulations.

68. The FDIC denies the allegations in Paragraph 68, except it admits that on September 10, 2025, CONA deposited security in the amount of the invoice owed.

## COUNT I – DECLARATORY JUDGMENT

69. The FDIC denies the allegations in Paragraph 69.

70. The FDIC denies the allegations in Paragraph 70, except it admits that it did not use the uninsured deposit amount reported on CONA's inaccurately amended December 2022 Call Report in calculating CONA's special assessment base, and it further admits that the FDIC's calculation included the Intercompany Deposit, which was erroneously excluded from CONA's amended December 2022 Call Report.

71. The FDIC admits the allegations in Paragraph 71.

72. The FDIC states that Paragraph 72 sets forth legal conclusions to which no response is required, but to the extent a response nevertheless is required, the FDIC responds that

the Complaint does not plead a cause of action upon which relief can be granted. The FDIC further responds that CONA is not entitled to any of the declaratory relief it seeks.

73. The FDIC states that Paragraph 73 sets forth legal conclusions to which no response is required, but to the extent a response nevertheless is required, the FDIC denies the allegations of this Paragraph.

74. The FDIC states that Paragraph 74 sets forth legal conclusions to which no response is required, but to the extent a response nevertheless is required, the FDIC denies the allegations of this Paragraph.

75. The FDIC states that Paragraph 75 sets forth legal conclusions to which no response is required, but to the extent a response nevertheless is required, the FDIC denies the allegations of this Paragraph.

## AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

This Court lacks jurisdiction over CONA's declaratory judgment claim. The Declaratory Judgment Act does not provide jurisdiction independently, and CONA has not pled an underlying substantive cause of action. Further, 12 U.S.C. § 1817(g) provides specific procedures for resolving assessment-related disputes between the FDIC and a bank, and those procedures do not include a statutory cause of action allowing banks to seek declaratory relief as to their unpaid deposit insurance assessments.

**Affirmative Defense No. 2**

The Complaint fails to state a claim upon which relief can be granted.

Respectfully submitted,

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew J. Dober
Senior Counsel

/s/ *Sarah E. Paulson*
Sarah E. Paulson (Va. No. 87509)
Andrew A. Nicely (Va. No. 41750)
Jason Benton (NY Bar No. 3994563)
3501 Fairfax Drive, D-7028
Arlington, VA 22226-3500
Tel.: (703) 486-6861
Fax: (703) 562-2477
Email: spaulson@fdic.gov

*Counsel for Defendant/Counterclaim-plaintiff*
Federal Deposit Insurance Corporation

DATED: November 17, 2025

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record registered to receive such notices.

/s/ *Sarah E. Paulson*
Sarah E. Paulson