# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

CAPITAL ONE, NATIONAL ASSOCIATION,

    Plaintiff/Counterclaim-Defendant,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,

    Defendant/Counterclaim-Plaintiff.

**Case No. 1:25-cv-1515-RDA-LRV**

## FEDERAL DEPOSIT INSURANCE CORPORATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND IN SUPPORT OF FDIC'S CROSS-MOTION FOR JUDGMENT ON THE <u>PLEADINGS AS TO PLAINTIFF'S COMPLAINT</u>

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew J. Dober
Senior Counsel

Andrew A. Nicely (Va. No. 41750)
Sarah E. Paulson (Va. No. 87509)
Jason Benton (NY Bar No. 3994563)
3501 Fairfax Drive, D-7028
Arlington, VA 22226-3500
Tel.: (703) 516-5729
Fax: (703) 562-2477
Email: anicely@fdic.gov

*Counsel for Defendant/Counterclaim-Plaintiff*
Federal Deposit Insurance Corporation

DATED: February 2, 2026

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

    A. The Parties ............................................................................................... 3

    B. The Deposit Insurance System ................................................................ 3

    C. The Special Assessment ........................................................................... 4

    D. The "Intercompany Deposit" .................................................................... 5

    E. CONA's Call Reports ............................................................................... 6

    F. The Assessment Reporting Review And Resulting Invoices .................... 8

APPLICABLE LEGAL STANDARDS .......................................................................... 9

    A. Federal Rule of Civil Procedure 12(b)(1) ............................................... 9

    B. Federal Rule of Civil Procedure 12(b)(6) ............................................... 9

    C. Federal Rule of Civil Procedure 12(c) .................................................. 10

ARGUMENT ................................................................................................................ 11

I. CONA'S STANDALONE DECLARATORY JUDGMENT CLAIM FAILS ON  JURISDICTIONAL AND 12(b)(6) GROUNDS. ............................................. 11

    A. The Complaint Does Not Attempt To Plead A Claim Under Section 1817(g) And The DJA Is Not An Independent Source of Federal Jurisdiction. .......................... 11

    B. The Express Remedy Provided In Section 1817(g) Forecloses CONA's Reliance On The DJA. .................................................................. 13

    C. No Countervailing Reason Justifies The Use Of Declaratory Judgment Actions As An Alternative To The Statutory Refund Action Authorized By Congress. ............... 17

    D. There Is No Standalone Cause Of Action For A Declaratory Judgment. ....................... 18

II. CONA'S MOTION SHOULD BE DENIED BECAUSE IT CANNOT SHOW THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .............................. 19

A. CONA's Interpretation Of The Final Rule Is Foreclosed By The Plain Language Of The FDI Act. ........................................................................................ 19

1. The FDI Act authorizes the FDIC to reject erroneous and fraudulent Call Reports when calculating assessments. ......................................................... 19

2. The Final Rule does not, and could not, limit the FDIC's statutory authority to reject inaccurate data submitted by banks in their Call Reports. ........................... 22

B. CONA's Interpretation Of The Final Rule Would Defeat The Purpose Of Both The Rule And The Provisions Of The FDI Act Governing Assessments. .............................. 25

CONCLUSION ............................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Cases**             **Page(s)**

*118 East 60th Owners, Inc. v. Bonner Props, Inc.*,
  677 F.2d 200 (2d Cir. 1982) ............................................................................. 17

*Adams v. Bain*,
  697 F.2d 1213 (4th Cir. 1982) ........................................................................... 9

*Allen v. United States*,
  173 F.3d 533 (4th Cir. 1999) ............................................................................. 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................... 9, 10

*Axon v. FTC*,
  598 U.S. 175 (2023) ........................................................................................... 14

*B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*,
  98 F.4th 542 (4th Cir. 2024) .............................................................................. 26

*Bd. of Governors v. DLG Fin. Corp.*,
  29 F.3d 993 (5th Cir. 1994) ............................................................................... 18

*Bechtel v. Pension Benefit Guar. Corp.*,
  781 F.2d 906 (D.C. Cir. 1985) ........................................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... 9, 10

*Blankenship v. Manchin*,
  471 F.3d 523 (4th Cir. 2006) ............................................................................. 10

*Block v. North Dakota ex rel. Board of University & School Lands*,
  461 U.S. 273 (1983) ..................................................................................... 13, 14

*Brown v. GSA*,
  425 U.S. 820 (1976) ........................................................................................... 13

*Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*,
  86 F. Supp. 3d 464 (E.D. Va. 2015) ................................................................... 18

*Cisco Sys., Inc. v. Synamedia Ltd.*,
  557 F. Supp. 3d 464 (S.D.N.Y. 2021) ................................................................ 19

*City Nat'l Bank v. Edmisten*,
   681 F.2d 942 (4th Cir. 1982) .................................................................... 13

*City of Colton v. Am. Promotional Events*,
   614 F.3d 998 (9th Cir. 2010) .................................................................... 16

*Clear Sky Car Wash, LLC v. City of Chesapeake*,
   910 F. Supp. 2d 861 (E.D. Va. 2012) ...................................................... 18

*Clear Sky Car Wash, LLC v. City of Chesapeake*,
   743 F.3d 438 (4th Cir. 2014) .................................................................... 18

*Cooper v. United States*,
   989 F.2d 491 (4th Cir. 1993) .................................................................... 15

*Doe v. Coastal Carolina Univ.*,
   359 F. Supp. 3d 367 (D.S.C. 2019)........................................................... 18

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC*,
   53 F.3d 1395 (4th Cir. 1995) .................................................................... 16

*E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*,
   213 F.3d 175 (4th Cir. 2000) .................................................................... 10

*EC Term of Years Tr. v. United States*,
   550 U.S. 429 (2007)............................................................................ 16, 17

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .................................................................... 10

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ...................................................................... 9

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)..................................................................................... 9

*Flora v. United States*,
   357 U.S. 63 (1958)..................................................................................... 15

*Flora v. United States*,
   362 U.S. 145 (1960)................................................................................... 15

*Foskaris v. Experian Info. Sols., Inc.*,
   No. 2:17-cv-00506-KJD-PAL, 2018 WL 3381394 (D. Nev. July 11, 2018) ...................... 16-17

*Foskaris v. Experian Info. Sols., Inc.*,
  808 Fed. App'x 436 (9th Cir. 2020) ................................................................ 17

*Gunter v. Farmers Ins. Co.*,
  736 F.3d 768 (8th Cir. 2013) .......................................................................... 16

*Helvering v. Sabine Transp. Co.*,
  318 U.S. 306 (1943) ........................................................................................ 25

*Hinck v. United States*,
  550 U.S. 501 (2007) ........................................................................... 13, 14, 17

*Hindes v. FDIC*,
  137 F.3d 148 (3d Cir. 1998) ............................................................................ 18

*Hutchens v. McDougal*,
  No. 1:21-cv-982 (RDA/TCB), 2022 WL 2440347 (E.D. Va. July 5, 2022) ............................ 21

*Hyatt v. USPTO*,
  No. 13-cv-1535, 2014 WL 2446176 (E.D. Va. May 29, 2014) ............................ 16

*Hyatt v. USPTO*,
  797 F.3d 1374 (Fed. Cir. 2015) ....................................................................... 16

*In re Brown*,
  932 F.3d 162 (4th Cir. 2019) .......................................................................... 30

*Jackson v. Lykes Bros. S.S. Co.*,
  386 U.S. 731 (1967) ........................................................................................ 30

*Johnson v. S. Pac. Co.*,
  196 U.S. 1 (1904) ............................................................................................ 25

*Kentuckians for Commonwealth, Inc. v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) .......................................................................... 26

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) .......................................................................................... 9

*Lopez v. Davis*,
  531 U.S. 230 (2001) ........................................................................................ 21

*MacKenzie Med. Supply, Inc. v. Leavitt*,
  506 F.3d 341 (4th Cir. 2007) .......................................................................... 21

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,
 297 U.S. 129 (1936) ................................................................................ 25

*Massey v. Ojaniit*,
 759 F.3d 343 (4th Cir. 2014) ............................................................... 10-11

*Miller v. United States*,
 294 U.S. 435 (1935) ................................................................................ 25

*Mullinex v. John Crane, Inc.*,
 No. 4:18-cv-33, 2022 WL 16814885 (E.D. Va. Nov. 8, 2022) ................. 10

*Qwest Commc'ns Corp. v. Maryland-Nat'l Cap. Park & Plan. Comm'n*,
 No. RWT 07cv2199, 2010 WL 1980153 (D. Md. May 13, 2010) ............ 13

*Savage Servs. Corp. v. United States*,
 25 F.4th 925 (11th Cir. 2022) ................................................................ 14

*Schilling v. Rogers*,
 363 U.S. 666 (1960) ................................................................................ 13

*Sorrells v. United States*,
 287 U.S. 435 (1932) .......................................................................... 26, 30

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998) .................................................................................. 9

*United States ex rel. Vuyyuru v. Jadhav*,
 555 F.3d 337 (4th Cir. 2009) .................................................................. 9

*United States v. American Trucking Ass'ns*,
 310 U.S. 534 (1940) ................................................................................ 25

*United States v. Blow*,
 No. 2:25po2, 2025 WL 1699832 (E.D. Va. June 17, 2025) ..................... 26

*United States v. Bormes*,
 568 U.S. 6 (2012) .................................................................................... 16

*United States v. Brown*,
 333 U.S. 18 (1948) .................................................................................. 30

*United States v. Larinoff*,
 431 U.S. 864 (1977) ................................................................................ 25

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
  83 F.3d 660 (4th Cir. 1996) ................................................................... 16

*United States v. Wall*,
  670 F.2d 469 (4th Cir. 1982) ................................................................... 25

*William v. Gonzales*,
  499 F.3d 329 (4th Cir. 2007) ................................................................... 25

*Witthohn v. Fed. Ins. Co.*,
  164 Fed. App'x 395 (4th Cir. 2006) ........................................................ 10

Statutes

12 U.S.C. §§ 1811-1835a ........................................................................... 3

12 U.S.C. § 1811(a) ................................................................................... 20

12 U.S.C. § 1813(q)(1)(A) ......................................................................... 28

12 U.S.C. § 1817 ................................................................................ *passim*

12 U.S.C. § 1818(a)(2) .............................................................................. 16

12 U.S.C. § 1818(i) .................................................................................... 18

12 U.S.C. § 1818(i)(1) ............................................................................... 18

12 U.S.C. § 1823(c)(4)(G)(ii) ................................................... 4, 20, 26, 29

12 U.S.C. § 1828(h) .................................................................................. 16

28 U.S.C. § 2201 ................................................................................ 11, 13

Pub. L. No. 81-797, 64 Stat. 873 (1950) .................................................. 12

Pub. L. No. 109-171, 120 Stat. 4 (2006) .................................................. 12

Regulations

12 C.F.R. § 4.2 ......................................................................................... 28

12 C.F.R. § 327.13 ............................................................................. *passim*

12 C.F.R. § 327.3 ...................................................................................... 12

12 C.F.R. § 327.4 ...................................................................................... 24

12 C.F.R. § 327.4(c) .................................................................................. 12

12 C.F.R. § 327.5 ...................................................................................... 24

## Rules

Fed. R. Civ. P. 12(b)(1)............................................................................................ 9, 30

Fed. R. Civ. P. 12(b)(6)............................................................................ 9, 10, 11, 18, 30

Fed. R. Civ. P. 12(c) ...................................................................................... 10, 11, 30

## Other Authorities

88 Fed. Reg. 32694 (May 22, 2023) ............................................................................. 4

88 Fed. Reg. 83329 (Nov. 29, 2023)................................................................. 5, 22, 27

90 Fed. Reg. 59369 (Dec. 19, 2025) ..................................................................... 2, 29

H.R. Rep. No. 2564, 1950 WL 1839 (1950)......................................................... 12, 16

Bank Financial Reports, FDIC (last updated Mar. 21, 2022),
https://www.fdic.gov/bank-financial-reports................................................................ 24

Call Report Instructions, General Instructions,
https://www.fdic.gov/resources/ bankers/call-reports/crinst-031-041/2022/2022-12-
generalinstructions.pdf................................................................................................. 5

Estimated Uninsured Deposits Reporting Expectations, FDIC (July 24, 2023),
https://www. fdic.gov/news/financial-institution-letters/2023/estimated-uninsured-deposits-
reporting-expectations.................................................................................................. 4

Defendant and Counterclaim-Plaintiff Federal Deposit Insurance Corporation ("FDIC") respectfully submits this memorandum in opposition to the motion for judgment on the pleadings filed by Plaintiff/Counterclaim-Defendant Capital One, National Association ("CONA"), and in support of the FDIC's cross motion for judgment on the pleadings as to CONA's complaint. CONA's complaint should be dismissed because it does not plead any cause of action over which the Court has subject matter jurisdiction. In addition, CONA's motion for judgment on the pleadings fails because CONA is not entitled to judgment as a matter of law on its request for a declaratory judgment. The Court can, and should, maintain jurisdiction over the FDIC's counterclaim seeking to recover CONA's underpayment of the special assessment.

## INTRODUCTION

This case concerns CONA's attempt to avoid paying its fair share of an FDIC special assessment. The FDIC's Deposit Insurance Fund ("DIF") paid out billions of dollars to protect the depositors of two large regional banks that failed in March 2023. The FDIC announced that, as required by statute, it would recoup these losses through a special assessment. The FDIC also identified the financial information that the agency would rely on in calculating that special assessment, which, for each bank to be assessed, would be its uninsured deposits during the quarter before the regional banks failed. Upon learning how the special assessment would be calculated, CONA caused one of its subsidiaries to issue a "retroactive" dividend and restated its uninsured deposits in a way that would reduce CONA's share of the special assessment. The FDIC rejected CONA's attempt at revisionist accounting and invoiced the bank for the correct amount of its special assessment. Instead of paying what it owes, CONA has appealed to this Court for a declaratory judgment and now moves for judgment on the pleadings. CONA's argument, if adopted, would allow CONA to opt out of paying its fair share of the special assessment, while

forcing other insured banks that accurately reported their financial metrics to bear a disproportionate share of the total special assessment.[1]

In its motion for judgment on the pleadings, CONA argues that it merely is capitalizing on a loophole in the FDIC's special assessment rule. It contends that the rule obligates the FDIC to calculate each bank's special assessment using the data supplied by the bank in its Call Report for the quarter ending December 31, 2022. According to CONA, the FDIC cannot disregard banks' self-reported data—*even if it is found to be incorrect or, worse, fraudulent*—unless the bank amends its Call Report. The catch, as CONA sees it, is that the FDIC can require banks under its supervision to amend their Call Reports, so that the special assessment can be calculated correctly, but the agency cannot compel amendments from banks supervised by other federal regulators. CONA, in its Rule 12(c) motion, urges the Court to ratify this interpretation.

CONA's motion should be denied for two independent reasons. First, CONA's complaint does not plead any cause of action over which this Court has subject matter jurisdiction. CONA appropriately recognized that it could not make out a refund claim under the Federal Deposit Insurance Act ("FDI Act"), and it is well settled that the Declaratory Judgment Act does not, standing alone, create subject matter jurisdiction. Second, on the merits, CONA has not established that it is entitled to judgment as a matter of law—a prerequisite for any litigant seeking relief under Rule 12(c). CONA's legal theory cannot be squared with the plain language of the FDI Act or the statutory objectives that underlie its enactment. Accordingly, CONA's motion should be denied in its entirety.

---

[1] As of September 30, 2025, the estimated total loss from the systemic risk determination was $16.7 billion and the FDIC had collected $12.7 billion from over 100 banks. 90 Fed. Reg. 59369, 59370-71 (Dec. 19, 2025). Over a dozen banks made substantive amendments to their Call Reports during the rulemaking process for the special assessment. All of those banks, except CONA, have made any necessary corrections to their Call Reports to accurately report uninsured deposits.

**FACTUAL BACKGROUND**

**A.     The Parties**

The FDIC is an agency of the United States responsible for insuring deposits and making large and complex financial institutions resolvable, along with other supervisory and receivership functions. FDIC Counterclaim & Answer ("Clm.") ¶ 3, ECF No. 18. CONA is a national banking association headquartered in McLean, Virginia. CONA Complaint & FDIC Answer ("C&A") ¶ 16, ECF No. 1. CONA offers financial services to its customers, including credit card lending. C&A ¶ 20. As part of its lending business, CONA offers credit cards and may securitize the receivables that are generated. *Id.*

**B.     The Deposit Insurance System**

The FDIC insures each depositor's account at each insured institution up to $250,000. If an institution fails, the FDIC ensures that depositors have timely access to their insured deposits, funding any shortfalls from the DIF. Clm. ¶ 8. As required by the FDI Act, 12 U.S.C. §§ 1811-1835a, the FDIC funds the DIF with risk-based assessments collected from FDIC-insured institutions. Clm. ¶ 9.

In accordance with the FDI Act, the FDIC uses data reported in Schedule RC-O of the Call Report to determine each bank's deposit insurance assessment. Schedule RC-O requires banks to report their total deposits and total estimated uninsured deposits. Uninsured deposits are deposits that exceed the FDIC insurance limit (currently $250,000 per depositor, per ownership category). Clm. ¶ 16.

Institutions are required by law to provide accurate information on their Call Reports. *See* 12 U.S.C. § 1817(c). Clm. ¶ 10. Two separate certifications as to the accuracy of the Call Report are statutorily required. *See* 12 U.S.C. § 1817(a)(3). Clm. ¶ 17.

## C. The Special Assessment

Signature Bank of New York ("Signature"), and Silicon Valley Bank of California ("SVB") failed in March 2023, and the FDIC was appointed receiver for both institutions. C&A ¶¶ 2, 44-45; Clm. ¶ 18. Prior to failure, both Signature and SVB held large amounts of uninsured deposits. C&A ¶ 2; Clm. ¶ 18. The systemic risk exception for both the SVB and Signature failures was invoked and all depositors at these institutions—including those with uninsured deposits—were protected. C&A ¶¶ 3, 46; Clm. ¶ 19. To recoup the losses to the DIF resulting from the invocation of the systemic risk exception, the FDIC was statutorily required to impose a special assessment. *See* 12 U.S.C. § 1823(c)(4)(G)(ii) (Repayment of loss). Clm. ¶ 19.

On May 11, 2023, the FDIC published a notice of proposed rulemaking ("NPR"), setting out the agency's proposed plan for calculating the statutorily required special assessment. Clm. ¶ 20. The NPR explained that the special assessment would be calculated using each insured depository institution's ("IDI's") estimated uninsured deposits as reported on its Call Report as of December 31, 2022 (adjusted to exclude the first $5 billion). *See* 88 Fed. Reg. 32,694-01 (May 22, 2023). Clm. ¶ 20.

On July 24, 2023, the FDIC issued a Financial Institution Letter ("FIL") titled "Estimated Uninsured Deposits Reporting Expectations."[2] Clm. ¶ 38. In the FIL, the FDIC explained that the agency had observed that—following the publication of the NPR issued in May—some banks were reducing the amount of uninsured deposits reported on their Call Reports by filing amendments that improperly "exclude[ed] intercompany deposit balances of subsidiaries." Clm. ¶¶ 39-40. The FIL further explained the Call Report instructions expressly require that all deposits of subsidiaries

---

[2] *See* Estimated Uninsured Deposits Reporting Expectations, FDIC (July 24, 2023), https://www.fdic.gov/news/financial-institution-letters/2023/estimated-uninsured-deposits-reporting-expectations.

4

"that are consolidated, and therefore eliminated from reported deposits on a bank's balance sheet, must be reported in Schedule RC-O."[3] Clm. ¶ 40.

On November 16, 2023, the FDIC adopted the final rule implementing the special assessment to recoup the losses to the DIF from the invocation of the systemic risk exception ("Final Special Assessment Rule"). 88 Fed. Reg. 83,329 (Nov. 29, 2023). C&A ¶¶ 4, 47; Clm. ¶ 21. The Final Special Assessment Rule provides that each bank's special assessment will be calculated based on its uninsured deposits for the quarter ended December 31, 2022, reported as of the later of: (1) November 2, 2023, adjusted for mergers prior to March 12, 2023; or (2) the date of the institution's most recent amendment to its Call Report for the quarter ended December 31, 2022, if such amendment arises from, or is confirmed through, the FDIC's Assessment Reporting Review. 12 C.F.R. § 327.13(f). To ensure the accuracy of Call Report amendments and in response to comments during the rulemaking, the FDIC announced in the preamble to the Final Rule that it would be conducting reviews to "confirm the correctness of any assessment" pursuant to its statutory authority to verify the accuracy of assessments. 12 U.S.C. § 1817(b)(4); 88 Fed. Reg. at 83337 n.28.

**D.      The "Intercompany Deposit"**

Capital One Funding, LLC ("Funding"), is a wholly owned subsidiary of CONA. C&A ¶ 25; Clm. ¶ 25. According to the complaint, Funding is a special purpose vehicle created to facilitate CONA's credit card securitization activities by purchasing credit card receivables originated by CONA and transferring those receivables to a securitization trust in exchange for a transferor interest in the trust portfolio. C&A ¶¶ 21-22; Clm. ¶ 26.

---

[3] *See* Call Report Instructions, General Instructions, at 12, https://www.fdic.gov/resources/bankers/call-reports/crinst-031-041/2022/2022-12-generalinstructions.pdf.

Prior to October 1, 2022, Funding was a wholly owned subsidiary of Capital One Bank (USA), National Association ("COBNA"). C&A ¶ 24; Clm. ¶ 25. Before that, it was a wholly owned subsidiary of COBNA's predecessor, Capital One Bank. C&A ¶ 24; Clm. ¶ 25. On October 1, 2022, COBNA merged with CONA, at which point Funding became a wholly owned subsidiary of CONA. C&A ¶ 25; Clm. ¶ 25.

Prior to its merger with CONA, COBNA and Funding entered into an Intercompany Money Market Deposit Account Agreement (the "MMDA Agreement") dated as of November 20, 2013. C&A ¶ 33; Clm. ¶ 27. CONA succeeded to COBNA's interests under the MMDA Agreement when the two institutions merged on October 1, 2022. Clm. ¶ 27.

The MMDA Agreement memorializes that "Funding intends to open a money market deposit account . . . with [CONA] to make deposits and withdrawals." Clm. ¶ 27. The Agreement provides that the MMDA would bear, accrue, and compound interest. *Id.* ¶ 28. In accordance with the MMDA Agreement, CONA paid interest on Funding's account balance. *Id.* Paragraph 5 of the MMDA Agreement states: "The MMDA is insured by the Federal Deposit Insurance Corporation to the maximum allowed by applicable law, and is not otherwise insured or guaranteed by COBNA, the United States Government or any agency thereof." *Id.* ¶ 29.

As of December 31, 2022, Funding's MMDA held approximately $56 billion in deposits (the "Intercompany Deposit"). Clm. ¶ 30. Of this amount, $250,000 was protected by the deposit insurance that the FDIC provides, and the remainder was an uninsured deposit. *Id.* ¶ 30.

**E.     CONA's Call Reports**

In February 2023, CONA filed its original December 2022 Call Report. C&A ¶ 34. On Schedule RC-O of that Call Report, CONA included the $56 billion Intercompany Deposit under "Total deposit liabilities" and "Estimated amount of uninsured deposits." C&A ¶ 35; Clm. ¶ 31.

In April 2023, CONA filed its original March 2023 Call Report. C&A ¶ 35; Clm. ¶ 32. On Schedule RC-O of that Call Report, CONA included the $56 billion Intercompany Deposit under "Total deposit liabilities" and "Estimated amount of uninsured deposits." C&A ¶ 35; Clm. ¶ 32.

In June 2023—one month after the NPR proposing to calculate the special assessment based on the amount of uninsured deposits in each bank's December 2022 Call Report—CONA caused Funding to declare a distribution of $54 billion of the approximately $56 billion Intercompany Deposit, payable from Funding's MMDA to CONA. C&A ¶¶ 10, 40; Clm. ¶ 35. CONA claimed that this distribution purportedly was retroactive to October 1, 2022, the previous calendar year. C&A ¶¶ 10, 40; Clm. ¶ 35.

Also in June 2023, one month after the NPR, CONA amended its December 2022 Call Report by removing the $56 billion Intercompany Deposit from the total deposits and uninsured deposits reported on Schedule RC-O. C&A ¶¶ 9, 41; Clm. ¶ 36. This was based on the contention that the $54 billion distribution in June 2023 was retroactive to October 1, 2022, along with CONA's contention that the Intercompany Deposit was not in fact a "deposit," notwithstanding all the contrary representations in the MMDA Agreement between CONA and Funding. C&A ¶¶ 7-10, 41; Clm. ¶ 36. In July 2023, CONA amended its March 2023 Call Report, similarly eliminating the Intercompany Deposit from the total deposits and total uninsured deposits that CONA reported on Schedule RC-O. C&A ¶ 41; Clm. ¶ 37.

Every Call Report that CONA submitted for the fourth quarter of 2022 through the most recent quarter was certified by CONA as true and correct pursuant to 12 U.S.C. § 1817(a)(3). Clm. ¶ 42.

**F.      The Assessment Reporting Review And Resulting Invoices**

In February and March of 2024, the FDIC conducted an Assessment Reporting Review of 30 banks subject to the special assessment, which included reviewing CONA's December 2022 Call Report and the accompanying Schedule RC-O.  C&A ¶ 50; Clm. ¶ 43.  In June 2024, the FDIC informed CONA of the results of this review, advising, among other things, that CONA's amended December 2022 Call Report improperly excluded the $56 billion Intercompany Deposit from the total deposits and total uninsured deposits that CONA reported on Schedule RC-O.  C&A ¶ 50; Clm. ¶ 43.  The FDIC directed CONA to further amend its 2022 Call Report to correct this error, along with other identified errors.  C&A ¶ 50; Clm. ¶ 43.

CONA refused to further amend its amended December 2022 Call Report or its Call Reports for subsequent quarters, all of which improperly excluded the $56 billion Intercompany Deposit.  C&A ¶ 51; Clm. ¶ 47.

In June 2025, based on CONA's originally filed 2022 Call Report, along with subsequent information provided, the FDIC issued an invoice to CONA.  C&A ¶ 55; Clm. ¶ 44.  On July 8, 2025, the FDIC issued a corrected invoice based on additional information supplied by CONA, which updated CONA's estimated total special assessment amount to $474,080,869.06.  C&A ¶¶ 56, 63; Clm. ¶ 45.

CONA informed the FDIC that it disagreed with the estimated total assessment reflected in the July 8, 2025 corrected invoice.  C&A ¶¶ 60-63; Clm. ¶ 46.  Specifically, CONA claimed that, according to its calculations, using the amended version of its 2022 Call Report, its estimated total special assessment should be only $324,841,481.28.  C&A ¶ 63; Clm. ¶ 46.

On September 10, 2025, CONA deposited security in the amount of the invoice owed.  C&A ¶ 68.  CONA has not made full payment of the special assessment amounts invoiced through September 30, 2025.  Clm. ¶ 58.

**APPLICABLE LEGAL STANDARDS**

**A.      Federal Rule of Civil Procedure 12(b)(1)**

Federal district courts are courts of limited subject matter jurisdiction and possess only the jurisdiction granted to them by the United States Constitution and by federal statutes. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). When subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must show by a preponderance of the evidence that jurisdiction is proper in this Court. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). The Fourth Circuit has explained that, to resolve a Rule 12(b)(1) motion, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). The Supreme Court has explained that challenges to a court's subject matter jurisdiction generally should be resolved before any motion on the merits because subject matter jurisdiction is required to determine the validity of any claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

**B.      Federal Rule of Civil Procedure 12(b)(6).**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint consisting of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," is subject to dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678. The facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*,

550 U.S. at 555, or must be sufficient "to state a claim to relief that is plausible on its face." *Id.* at 570. A pleading must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

### C. Federal Rule of Civil Procedure 12(c)

A plaintiff seeking judgment on the pleadings under Rule 12(c) bears the burden of demonstrating that, based on the allegations in the complaint that are uncontested, and assuming the truth of all material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law. *See Mullinex v. John Crane, Inc.*, No. 4:18-cv-33, 2022 WL 16814885, at *2 (E.D. Va. Nov. 8, 2022); *accord* 5C Wright & Miller's FEDERAL PRACTICE & PROCEDURE § 1368 (3d ed. 2019) (explaining that "for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false"). When applying this test, the Court is not required to "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Nor is the Court required to accept allegations that "contradict matters properly subject to judicial notice or by exhibit." *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006) (citation omitted).

As is true with respect to motions to dismiss under Rule 12(b)(6), the Court properly "may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x 395, 396 (4th Cir. 2006) (per curiam); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (recognizing that Rule 12(c) motions are governed by the same standard as motions brought under Rule 12(b)(6)); *Massey v. Ojaniit*, 759

F.3d 343, 347 (4th Cir. 2014) ("Open to the district court's consideration were Massey's complaint; the officers' answers thereto; matters of public record; exhibits to the answers (as there were no exhibits to the complaint); and exhibits to the Rule 12(c) motions that were integral to the complaint and authentic.") (internal citations omitted).

**ARGUMENT**

**I. CONA'S STANDALONE DECLARATORY JUDGMENT CLAIM FAILS ON JURISDICTIONAL AND 12(b)(6) GROUNDS.**

CONA's Motion for Judgment on the Pleadings should be denied, and its Complaint should be dismissed because this Court lacks jurisdiction over its declaratory judgment claim, the sole cause of action asserted in the Complaint. C&A ¶¶ 69-75 (citing the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201). The DJA is not an independent source of federal jurisdiction. Section 1817 of the FDI Act, along with other provisions of the statute, establishes the exclusive statutory framework for resolving assessment disputes between the FDIC and insured depository institutions. As the FDIC explains in Part A below, CONA has not attempted to establish subject matter jurisdiction by pleading a cause of action cognizable under Section 1817(g). In Parts B & C, the FDIC shows that the availability of an express statutory remedy preempts other, more general, remedies, including the DJA, and no good reason exists to permit CONA to circumvent the statutory remedy that Congress provided. Finally, in Part D, the FDIC demonstrates that even if jurisdiction exists, the Complaint fails to state a cause of action, warranting dismissal under 12(b)(6) and denial of CONA's motion.

**A. The Complaint Does Not Attempt To Plead A Claim Under Section 1817(g) And The DJA Is Not An Independent Source of Federal Jurisdiction.**

The FDI Act provides two mechanisms for the resolution of assessment disputes between banks and the FDIC, the availability of which depends on whether the bank has paid the disputed assessment. A bank that pays the disputed assessment amount under protest, much like a taxpayer

that has paid a disputed federal tax liability, can file a lawsuit to recover the amount it contends it was overcharged.  *See* 12 U.S.C. § 1817(g)(2)(A) ("Any action by an insured depository institution to recover from the Corporation the overpaid amount of any assessment shall be brought within 3 years after the date the assessment payment was due . . . .").[4]  Alternatively, in the case of a bank that refuses to pay its assessment, ***the FDIC*** can file suit to recover the amount of the underpayment.  *Id.* § 1817(g)(1) ("The Corporation, in any court of competent jurisdiction, shall be entitled to recover from any insured depository institution the amount of any unpaid assessment lawfully payable by such insured depository institution.").[5]

Although CONA asserts in the Complaint that its "cause of action arises under the FDIA," Cmplt. ¶ 18, it does not attempt to plead a claim within the scope of Section 1817(g).  It could not do so because the Complaint acknowledges that CONA has not paid the portion of its special assessment that it disputes—an express requirement for actions governed by Section 1817(g).  *See* Cmplt. ¶¶ 65-68.  Nor does CONA purport to be seeking relief under any other provision of the FDI Act.  The statute does not authorize CONA's "sue now, pay later" approach.  To the contrary, the statute forecloses it by requiring banks to prepay the disputed assessment amount as a precondition to initiating an action against the FDIC.

---

[4]  The FDIC also affords banks  an administrative review process.  12 C.F.R. §§ 327.3(f) (Request for revision of computation of quarterly assessment payment), 327.4(c) (Requests for review).  That process culminates in a final agency determination by the FDIC's Assessment Appeals Committee ("AAC").  12 C.F.R. § 327.3(f)(3).

[5]  Subsection (g) dates back to the codification of the FDI Act in 1950.  *See* Pub. L. No. 81-797, § 7(g), 64 Stat. 873, 878 (1950).  It has remained substantially the same with the exception that the statute of limitations for overpayment or underpayment claims was changed from five to three years in 2005.  *See* Pub. L. No. 109-171, § 2104, 120 Stat. 4, 12 (2006).  Notably, in the 1950 enactment, Congress removed a provision setting forth a general five-year statute of limitations on all suits brought by or against the FDIC.  "The committee believes that, because of the several special statutes of limitation contained in this bill, this general provision is unnecessary."  H.R. Rep. No. 2564, at 5, 1950 WL 1839, at *3771 (1950).  This further demonstrates that Congress provided a specific cause of action with respect to assessment disputes in subsection (g).

Moreover, it is well established that "the Declaratory Judgment Act is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citation omitted); *accord City Nat'l Bank v. Edmisten*, 681 F.2d 942, 945 n.6 (4th Cir. 1982) ("[I]t is clear that § 2201 is remedial only, and is not itself a basis for federal subject matter jurisdiction."). As a result, litigants cannot use the DJA to end run Congress's decision not to recognize a private cause of action for a particular type of grievance. *See*, *e.g.*, *Qwest Commc'ns Corp. v. Maryland-Nat'l Cap. Park & Plan. Comm'n*, No. RWT 07cv2199, 2010 WL 1980153, at *10-11 (D. Md. May 13, 2010) ("The Declaratory Judgment Act cannot be used to circumvent Congress' intent not to provide telecommunications providers with a private cause of action[.]").

Simply put, CONA has not pleaded a cause of action over which this Court has subject matter jurisdiction.[6]

**B. The Express Remedy Provided In Section 1817(g) Forecloses CONA's Reliance On The DJA.**

The Supreme Court has recognized "[i]n a variety of contexts … that a precisely drawn, detailed statute pre-empts more general remedies." *Brown v. GSA*, 425 U.S. 820, 834 (1976); *see also Hinck v. United States*, 550 U.S. 501, 506 (2007). In *Hinck*, for example, the Court affirmed the dismissal of a taxpayer's abatement claim against the IRS filed under the Tucker Act based on the existence of a precisely drawn tax statute providing for jurisdiction in the Tax Court. Similarly, in *Block v. North Dakota ex rel. Board of University & School Lands*, 461 U.S. 273 (1983), the Court held that plaintiffs claiming an interest in real property of the United States may not rely on

---

[6] The FDIC denied jurisdiction in its Answer and Affirmative Defense. Clm. § 18. Capital One did not address jurisdiction in its opening brief. This is a separate basis for denial of the motion. The FDIC did not intend to burden the Court with this issue until summary judgment because the DJA claim does not impact the scope of discovery. Plaintiff's decision to seek judgment on the pleadings on its DJA claim required the FDIC to raise the jurisdictional issue at this time.

"officer's suits" or on other general remedies because the Quiet Title Act of 1972 is their exclusive recourse. *See Block*, 461 U.S. at 284-86.

This preemption rule makes sense because "when the legislature has attacked a specific problem and crafted a detailed and precise remedy to address that problem, [courts] should generally assume that the law represents Congress's considered and exclusive judgment on that issue." *Savage Servs. Corp. v. United States*, 25 F.4th 925, 939 (11th Cir. 2022). The preemptive effect of an express statutory remedy typically is treated as a jurisdictional defect when, as here, the plaintiff fails to invoke the statutory remedy. *See Axon v. FTC*, 598 U.S. 175, 185 (2023) ("A special statutory review scheme … may preclude district courts from exercising jurisdiction over challenges to federal agency action."); *Hinck*, 550 U.S. at 510 (affirming the Federal Circuit's dismissal of appeal for lack of subject matter jurisdiction because the precisely drawn, detailed statute designated the Tax Court as the exclusive forum and preempted more general remedies); *Savage Servs. Corp.*, 25 F.4th at 939 (holding that the Oil Pollution Act preempts general admiralty and FTCA claims; "Congress didn't draw up this carefully balanced design—a veritable super-structure of oil-cleanup rights, duties, and obligations—for no reason. It did it to strike the right incentives within the oil industry itself….").

To determine whether an express statutory remedy is drawn precisely enough to displace other remedies, courts consider several factors, including whether the statute provides a forum for adjudication, pertains to a limited class of potential plaintiffs, contains a statute of limitations, and authorizes judicial relief. *See Hinck*, 550 U.S. at 506. Here, these factors support the conclusion that the specific remedies provided in Section 1817 displace other more general remedies, including declaratory judgments. First, the only potential plaintiffs in actions governed by Section 1817 are the FDIC, in the case of lawsuits to recover underpayments of assessments, and insured

depository institutions, in the case of lawsuits to recover overpayments. Second, Section 1817(g) sets out the applicable statute of limitations. *See* 12 U.S.C. § 1817(g)(2)(A)-(E).

Nowhere in this detailed statutory scheme is a bank afforded the option to refuse to pay and then sue the FDIC for a judicial declaration that it does not owe the disputed amount. Subsection (g) authorizes an action by a bank "to recover from the Corporation the overpaid amount of any assessment…." 12 U.S.C. § 1817(g)(2)(A). It is clear from the plain text of the statute that prepayment is a condition precedent to "recover" the "overpaid amount" because, just as in a tax case, without payment there is nothing to recover. *See Flora v. United States*, 357 U.S. 63, 75 (1958) (holding that taxpayers challenging a tax assessment must "pay first and litigate later."); *Cooper v. United States*, 989 F.2d 491 (4th Cir. 1993) (per curiam) (dismissing tax refund suit because prepayment was a condition precedent to jurisdiction; "Under the Supreme Court's decision in *Flora v. United States*, 357 U.S. 63 (1958), *aff'd on reh'g*, 362 U.S. 145 (1960), a taxpayer must prepay the full amount of the tax assessed for the relevant tax period before filing suit for a refund.").

Section 1817(h) of the FDI Act reinforces the conclusion that payment followed by a refund action is the sole mechanism for a bank seeking to sue the FDIC over its assessments. The first several sentences of subsection (h) empower the FDIC to undertake charter revocation proceedings in the event a bank does not pay its assessments and sets forth the procedures for doing so. *See* 12 U.S.C. § 1817(h). The last sentence of subsection (h) states that the express remedies in section 1817—suits for underpayment and charter revocation proceedings—"shall not be construed as limiting any other remedies *against any insured depository institution, but shall be in addition thereto*." 12 U.S.C § 1817(h) (emphasis added). In other words, when it comes to deposit insurance assessments, Congress made clear that the FDIC is authorized to bring statutorily

15

created claims under subsections (f), (g), and (h) as well as other non-statutory, common-law remedies. *See Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1408 (4th Cir. 1995) (section 1817(h) "is clear on its face that the remedies of section 1817(g) are *in addition to* any other remedy against an insured depository institution available to the FDIC").[7] Other provisions of the FDI Act also authorize civil money penalties for late or non-payment of assessments or failure to make an accurate certified statement, 12 U.S.C. § 1817(a)(1), (c)(4), § 1828(h), as well as termination of deposit insurance, § 1818(a)(2). By contrast, nothing in the FDI Act affords banks any other remedy apart from a refund action under 12 U.S.C. § 1817(g)(2)(A). In fact, in declining to impose a general statute of limitations on all actions against the FDIC when the FDI Act was codified in 1950, Congress emphasized that it created specific, not general, causes of action against the FDIC in specific provisions of the FDI Act. H.R. Rep. No. 2564 at 5, 1950 WL 1839, at *3771.

Preempted "general remedies" include statutory claims and declaratory judgments. *See, e.g.*, *United States v. Bormes*, 568 U.S. 6, 12-16 (2012) (Tucker Act claim preempted); *EC Term of Years Tr. v. United States*, 550 U.S. 429, 433-36 (2007) (statutory tax refund claim preempted); *Hyatt v. USPTO*, No. 13-cv-1535, 2014 WL 2446176, at *2 (E.D. Va. May 29, 2014) (declaratory judgment and request for injunctive relief preempted), *aff'd*, 797 F.3d 1374 (Fed. Cir. 2015); *Gunter v. Farmers Ins. Co.*, 736 F.3d 768, 773 (8th Cir. 2013) (remedies in National Flood Insurance statute preempted more general remedies including declaratory judgment); *see also City of Colton v. Am. Promotional Events*, 614 F.3d 998 (9th Cir. 2010) (declaratory relief as to future costs preempted); *Foskaris v. Experian Info. Sols., Inc.*, No. 2:17-cv-00506-KJD-PAL, 2018 WL

---

[7] Empowering the FDIC to collect the assessments that it imposes is consistent with the principle that the government has an inherent right to recoup funds owed to it. *See United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4th Cir. 1996); *Bechtel v. Pension Benefit Guar. Corp.*, 781 F.2d 906, 907 (D.C. Cir. 1985) (per curiam).

3381394, at *4 (D. Nev. July 11, 2018) (declaratory judgment claim preempted), *aff'd*, 808 Fed. App'x 436 (9th Cir. 2020).

    **C.    No Countervailing Reason Justifies The Use Of Declaratory Judgment Actions As An Alternative To The Statutory Refund Action Authorized By Congress.**

The Supreme Court has recognized that a precisely drawn statutory remedy should be deemed to preempt more general remedies absent a good countervailing reason to conclude otherwise. *See EC Term of Years*, 550 U.S. at 434 ("Resisting the force of the better fitted statute requires a good countervailing reason[.]"). No such reason exists here. To the contrary, there are important reasons why this Court should reject CONA's attempt to circumvent the requirements of Section 1817. First, the FDIC's counterclaim is the proper statutory mechanism for litigating CONA's liability for refusing to pay the full amount of its special assessment. That dispute will be adjudicated under a jurisdiction-conferring statute.

Second, there are more than 4,300 FDIC-insured banks in the United States. Allowing banks that refuse to pay their assessments to bring declaratory judgment actions would enable them to "effortlessly evade" a carefully calibrated statutory scheme. *Hinck*, 550 U.S. at 507 (*quoting EC Term of Years*, 550 U.S. at 434).

Third, permitting freestanding declaratory judgment actions would effectively nullify the statute of limitations in 12 U.S.C. § 1817(g)(2). The DJA does not have a statute of limitations because it is not a stand-alone claim. *See 118 East 60th Owners, Inc. v. Bonner Props, Inc.*, 677 F.2d 200, 202 (2d Cir. 1982) (explaining that the DJA does not provide a statute of limitations but rather adopts the applicable limitations of the suit "in which the issues involved would have been litigated if the [DJA] had not been adopted."). Because CONA asserts no substantive cause of action, DJA suits could be utilized to seek refunds well beyond Section 1817(g)'s three-year statute of limitations.

Fourth, entertaining CONA's DJA action could improperly constrain the FDIC's ability to pursue potential administrative enforcement proceedings against the bank for failure to pay its assessments and/or accurately certify its statements, a result prohibited by statute. Congress provided in 12 U.S.C. § 1818(i)(1) that, although the FDIC may bring district court actions to enforce its administrative orders, district courts may not otherwise "affect by injunction or otherwise the issuance or enforcement of any notice or order [or] review, modify, suspend, terminate, or set aside any such notice or order."

Courts have recognized that Section 1818(i) prohibits injunctive or declaratory relief that could "affect" the issuance of a notice of charges under the banking agency enforcement provisions. *See Bd. Of Governors v. DLG Fin. Corp.*, 29 F.3d 993, 999 (5th Cir. 1994) ("§ 1818(i)(1) divested the district court of jurisdiction to enjoin the commencement of the Board's administrative enforcement."); *Hindes v. FDIC*, 137 F.3d 148, 165 (3d Cir. 1998) ("Section 1818(i)(1) precludes the declaratory and injunctive relief sought here.").

**D.    There Is No Standalone Cause Of Action For A Declaratory Judgment.**

Even assuming that this Court has jurisdiction, the Complaint fails to state a cause of action under Rule 12(b)(6). That is because there is no standalone cause of action for a declaratory judgment. *See Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc.*, 86 F. Supp. 3d 464, 471 n.7 (E.D. Va. 2015) ("[T]he [DJA] does not create an independent cause of action[.]"); *Clear Sky Car Wash, LLC v. City of Chesapeake*, 910 F. Supp. 2d 861, 871 n.8 (E.D. Va. 2012), *aff'd*, 743 F.3d 438 (4th Cir. 2014). There must be a properly pled claim with an independent basis for jurisdiction apart from the DJA. *Campbell*, 86 F. Supp. 3d at 470; *Doe v. Coastal Carolina Univ.*, 359 F. Supp. 3d 367, 381 (D.S.C. 2019) ("The Court agrees that the DJA does not create its own substantive cause of action; rather, it is remedial only, and is not itself a basis for federal subject

matter jurisdiction."); *Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464 (S.D.N.Y. 2021) (pleading a "standalone" cause of action for a declaratory judgment is insufficient).

## II.  CONA'S MOTION SHOULD BE DENIED BECAUSE IT CANNOT SHOW THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

As CONA acknowledges, a plaintiff seeking judgment on the pleadings bears the burden of demonstrating, among other things, that it is "entitled to judgment as a matter of law." CONA's Mot. for J. on the Pleadings ("CONA Br.") at 9, ECF No. 26 (citation omitted). Here, CONA cannot carry its burden because its legal theory rests on an erroneous reading of the governing law. CONA's interpretation of the Final Rule is foreclosed by the plain language of the FDI Act, unsupported by anything in the Final Rule itself, and contrary to the manifest purpose of both the statute and the regulation. Accordingly, CONA's motion should be denied.

### A.  CONA's Interpretation Of The Final Rule Is Foreclosed By The Plain Language Of The FDI Act.

The central premise underlying CONA's motion for judgment on the pleadings is that the FDIC drafted the Final Rule inartfully and, in doing so, accidentally curtailed the agency's broad authority under the FDI Act to impose assessments on insured banks. That premise is wrong as a matter of law. The FDI Act unambiguously vests the FDIC with unfettered discretion to accept *or reject* any report submitted by a bank when determining that bank's assessments. The Final Rule does not limit that discretion. It could not have done so because it is well settled that agencies, through rulemaking, cannot amend their organizing statutes. Because CONA cannot establish that it is entitled to judgment as a matter of law, its Rule 12(c) motion should be denied.

#### 1.  The FDI Act authorizes the FDIC to reject erroneous and fraudulent Call Reports when calculating assessments.

One of the FDIC's core functions is to manage the DIF, which is used to protect the depositors of insured banks and to resolve failed banks. The FDIC funds the DIF primarily through

assessments on insured banks. To that end, the FDI Act grants the FDIC the sole authority to "establish a risk-based assessment system for insured depository institutions." 12 U.S.C. § 1817(b)(1)(A). The statute further empowers the FDIC to levy special assessments "in an amount determined by the Corporation . . . ." *Id.* § 1817(b)(5).[8] When the systemic risk exception is invoked—as it was in connection with the 2023 failures of two large banks—the FDI Act expressly requires the FDIC to prescribe rules imposing special assessments to recover all resulting losses to the DIF. *See id*. § 1823(c)(4)(G)(ii). The Final Rule at issue in this lawsuit was promulgated pursuant to that grant of authority.

In determining an insured bank's assessments, including special assessments, the FDIC uses financial information relating to the bank. Generally, that information is provided in the bank's Call Reports. Banks are responsible for preparing their Call Reports and submitting them to their primary federal regulator. Because the FDIC uses Call Report data to calculate assessments, the FDI Act provides that the agency "shall" have access to all Call Reports submitted to any banking regulator and also mandates that the FDIC "shall" be promptly advised of any "revisions or changes in respect to deposit liabilities" in any Call Report. 12 U.S.C. § 1817(a)(2).

The FDI Act includes several provisions designed to ensure that the data used by the FDIC to calculate each bank's assessments is both accurate and complete. First, the statute requires each bank to certify that its Call Reports and its Certified Statements are accurate. 12 U.S.C. § 1817(a)(1), (a)(3), (c). Second, Section 1817(b)(4) mandates that, for a period of not less than three years, "[e]ach insured depository institution shall maintain all records that the Corporation may require for verifying the correctness of any assessment on the insured depository institution under this subsection." *Id.* § 1817(b)(4). Third, the statute provides that the FDIC "may from time

---

[8] As used in the FDI Act, the "Corporation" means the FDIC. 12 U.S.C. § 1811(a).

to time require ***any*** insured depository institution to file such additional reports as the [FDIC] . . . may deem advisable for insurance purposes." *Id.* § 1817(a)(2)(B) (emphasis added). And fourth, Section 1817(a)(9) mandates that the FDIC "shall take such action as may be necessary to ensure" that it "receives on a regular basis from such institution, information on the total amount of all insured deposits, preferred deposits and uninsured deposits." *Id.* § 1817(a)(9).

Call Reports, like income tax returns, are submitted on the honor system, and are subject to verification by the FDIC. Nothing in the FDI Act expressly or even impliedly requires the FDIC to accept the data reported in a Call Report without verifying its accuracy. Instead, the statute empowers the FDIC to "verify[] the correctness of ***any*** assessment" by examining "all records" of the bank that are deemed relevant. *Id.* § 1817(b)(4) (emphasis added). In addition, the FDI Act unambiguously provides that the FDIC "***may accept*** any report made by or to any commission, board, or authority having supervision of a depository institution." *Id.* § 1817(a)(2) (emphasis added). The permissive term "may," when used in a statute, generally signals a grant of discretion. *See MacKenzie Med. Supply, Inc. v. Leavitt*, 506 F.3d 341, 347-48 (4th Cir. 2007); *Hutchens v. McDougal*, No. 1:21-cv-982 (RDA/TCB), 2022 WL 2440347, at *2 (E.D. Va. July 5, 2022) ("The use of the word 'may' in the statute indicates the award is permissive and not compulsory, meaning a defendant is not entitled to the award from the court."). Treating "may" as permissive is particularly appropriate when, as in the case of the FDI Act, Congress uses the mandatory term "shall" in other parts of the same statutory section. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same section.").

In sum, the FDI Act vests the FDIC with broad authority over the assessment process, including without limitation the power to require supplemental reports from insured banks, the

power to verify the information on their Call Reports, and the power to accept or reject Call Reports and other reports submitted by banks.

**2. The Final Rule does not, and could not, limit the FDIC's statutory authority to reject inaccurate data submitted by banks in their Call Reports.**

In May 2023, the FDIC announced in an NPR that it would be implementing a special assessment to recover the losses to the DIF resulting from the failures of SVB and Signature Bank. Clm. ¶ 20. Because SVB and Signature failed in part because of their large concentrations of uninsured deposits, the FDIC explained in the NPR that it intended to levy the special assessment on those banks that had significant uninsured deposits on their Call Reports as of the quarter ending December 31, 2022. During the notice and comment period, some commenters "raised concerns about the accuracy of the amount of estimated uninsured deposits reported on the Call Report." 88 Fed. Reg. at 83337. The FDIC responded to this concern in the Final Rule, explaining that "[c]onsistent with the FDIC's practice of conducting reviews … to confirm the correctness of any assessment, the FDIC will review an institution's reporting methodology for estimated uninsured deposits and related items." *Id.* at 83337 n.28 (citing 12 U.S.C. § 1817(b)(4)). Thus, the FDIC made clear in the Final Rule that it would be reviewing banks' self-reported information to ensure that it accurately reflected the true amount of uninsured deposits that they held as of December 31, 2022.

The Final Rule, as previewed in the NPR, provided that each bank's special assessment would be calculated based on its uninsured deposits as of December 31, 2022. 12 C.F.R. § 327.13(f), (i). As CONA points out, the Final Rule defines "uninsured deposits" to mean the "estimated uninsured deposits as reported in" the bank's December 2022 Call Report, "reported as of the later of: (1) November 2, 2023 . . . or (2) [t]he date of the institution's most recent amendment to its [December 2022 Call Report], if such amendment arises from, or is confirmed

22

through, the FDIC's Assessment Reporting Review." CONA Br. at 5 (excerpting 12 C.F.R. § 327.13(f)). CONA argues that this definition requires the FDIC to accept whatever uninsured deposit amount a bank reported on its December 2022 Call Report—even if the FDIC determined that the reported amount was erroneous or, worse, fraudulent—unless the bank submitted an amended Call Report containing a revised figure. *See id.* at 11-13. CONA's interpretation cannot be squared with the text of the Final Rule or the FDI Act.

First, nothing in the Final Rule states that the FDIC "must accept" a Call Report that understates—or, in the case of CONA's, that *grossly* understates—the amount of uninsured deposits held by the reporting bank. Nor could such a requirement be read into the Final Rule, because Section 327.13(f) confirms that the FDIC will be conducting Assessment Reporting Reviews to identify any errors in each bank's Call Report. *See* 12 C.F.R. § 327.13(f) (allowing Call Report amendments after November 2, 2023 that "arise[] from, or [are] confirmed through, the FDIC's Assessment Reporting Review"). To state the obvious, conducting Assessment Reporting Reviews would be a pointless exercise if—as CONA would have it—the FDIC were required to accept a bank's Call Report as filed, notwithstanding any material reporting errors that the FDIC detected during its reviews.

CONA attempts to reinforce its interpretation by suggesting that the Final Rule "stands in stark contrast" to the FDIC's regulations governing "regular assessments." CONA Br. at 11. According to CONA, the FDIC determines regular assessments by giving "each bank an 'assessment risk assignment' and calculat[ing] an 'assessment base' for each bank … which do not require reliance on amounts reported by Banks in their Call Reports." CONA Br. at 11 (citing 12 C.F.R. §§ 327.4, 327.5). That is incorrect. As one of the regulations that CONA points to, Section 327.5, makes clear, the assessment base for most insured banks is based on the "average

23

consolidated total assets of the insured depository institution during the assessment period," as reported in its "Consolidated Reports of Condition and Income," also known as a Call Report. 12 C.F.R. § 327.5(a)(1).[9] Thus, there is no merit to CONA's assertion that "[t]he FDIC chose to take a different approach in drafting the [Final] Rule, 12 C.F.R. § 327.13." CONA Br. at 11. Simply put, the FDIC is not obligated to accept incorrect (or fraudulent) Call Report data when calculating regular assessments, and it did not commit to doing so when it promulgated the Final Rule with respect to the special assessments relating to the 2023 bank failures.

Second, CONA's interpretation treats the Final Rule as amending, through agency rulemaking, the underlying statute that authorized the Rule. Specifically, and as explained in Part 1 above, Section 1817(a)(2) of the FDI Act gives the FDIC broad discretion to accept or reject banks' Call Reports. *See* 12 U.S.C. § 1817(a)(2) (FDIC "may accept any report made by or to any commission, board, or authority having supervision of a depository institution"). But under CONA's reading of the Final Rule, the FDIC ***must*** accept banks' Call Reports for purposes of calculating their special assessments, even if the information is incorrect and potentially fraudulent.

The FDIC, when it promulgated the Final Rule, neither abrogated its statutory discretion to reject Call Reports containing inaccurate data when calculating banks' special assessments nor its statutorily mandated duty to recoup all costs from invoking the systemic risk exception. As a matter of law, the agency could not have done so. It is well settled that "[a] regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936); *United States v. Larinoff*, 431 U.S.

---

[9]    *See also* Bank Financial Reports, FDIC (last updated Mar. 21, 2022), https://www.fdic.gov/bank-financial-reports (explaining that the FDIC uses "Call Report data to . . . calculate the deposit insurance assessments of institutions and the semiannual assessment fees of national banks and federal savings associations").

24

864, 877 (1977) (striking down regulations as "invalid" because they were "in clear conflict with the congressional intention in enacting" the underlying statute); *Helvering v. Sabine Transp. Co.*, 318 U.S. 306, 311-12 (1943) (striking down Treasury regulations, finding them to be "in the teeth of the unambiguous mandate of the statute, … contradictory of its plain terms, and amount[ing] to an attempt to legislate"); *Miller v. United States*, 294 U.S. 435, 440 (1935) ("The only authority conferred, or which could be conferred, by the statute is to make regulations to carry out the purposes of the act—not to amend it."); *Allen v. United States*, 173 F.3d 533, 536 (4th Cir. 1999) ("[W]e must overturn a regulation that clearly conflicts with the plain text of the statute."); *William v. Gonzales*, 499 F.3d 329, 334 (4th Cir. 2007) (recognizing that a regulation that "conflicts with the [authorizing] statute … lacks authority and is invalid"); *United States v. Wall*, 670 F.2d 469, 471 (4th Cir. 1982) (noting that "the regulations adopted must also be consistent with the statute under which they are promulgated").

The bottom line is that the plain language of the FDI Act forecloses CONA's contention that, by adopting the Final Rule, the FDIC obligated itself to accept Call Reports containing understated figures reflecting banks' uninsured deposits.

**B.      CONA's Interpretation Of The Final Rule Would Defeat The Purpose Of Both The Rule And The Provisions Of The FDI Act Governing Assessments.**

Statutes and regulations must be construed and applied in a way that carries out the objectives underlying their adoption. *See Johnson v. S. Pac. Co.*, 196 U.S. 1, 14 (1904) (rejecting statutory interpretation that was found to be "inconsistent with the plain intention of Congress" and that would "defeat the object of the legislation"); *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (explaining that, when the plain meaning of a statute produces an unreasonable result "'plainly at variance with the policy of the legislation as a whole[,]' this Court has followed that purpose, rather than the literal words [of the statute]"); *Sorrells v. United States*,

287 U.S. 435, 448 (1932) (adopting construction that effectuates the "intention of the Congress in enacting this statute"); *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 564 (4th Cir. 2024) ("Because a regulation must be consistent with the statute it implements, any interpretation of a regulation naturally must accord with the statute as well.") (internal citations omitted), *cert. granted*, 146 S. Ct. 57 (July 3, 2025) (No. 24-43); *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 440 (4th Cir. 2003) (construing regulation in light of Clean Water Act); *United States v. Blow*, No. 2:25po2, 2025 WL 1699832, at *4 (E.D. Va. June 17, 2025) (rejecting "argument [that] ignores the overall statutory and regulatory scheme that applies to the management of the National Wildlife Refuge System"). CONA's interpretation of the Final Rule does not advance the goals of the FDI Act and of the Rule itself; to the contrary, it thwarts them.

In 1933, Congress created the FDIC to restore public confidence in the nation's banking system during the Great Depression by establishing a system of deposit insurance. *See* 12 U.S.C. §§ 1811, 1819. The statute established the FDIC and cloaked it with the authority necessary to manage the DIF. In particular, Section 1817(b)(1) tasks the FDIC with establishing a risk-based assessment system, under which each bank's regular assessment is based on the likelihood that it will cause a loss to the DIF, the likely amount of such loss, and the revenue needs of the DIF. *See id*. § 1817(b)(1)(A)-(C). The FDI Act also requires the FDIC, in the wake of any bank failures triggering a systemic risk exception, to establish rules for a special assessment to recover all losses sustained by the DIF. *See id.* § 1823(c)(4)(G)(ii). The FDIC adopted the Final Rule in accordance with this statutory mandate. Exercising the discretion granted to it by the FDI Act, the FDIC determined in the Final Rule that the special assessment should be borne by banks that, like SVB and Signature, had substantial uninsured deposits on their books as of December 31, 2022. *See* Final Rule, 88 Fed. Reg. 83329, at 83331.

CONA had *substantial* uninsured deposit liabilities as of December 31, 2022. In fact, CONA's Call Report for that quarter, as originally filed, reflected uninsured deposits of more than $150 billion, a full $56 billion of which was held in the account of CONA's subsidiary, Funding. Clm. ¶ 30. Several weeks after the FDIC issued the NPR, at which point CONA learned that banks with large uninsured deposits would be subject to the special assessment, CONA took steps to avoid paying its fair share of the special assessment. In June 2023, CONA caused Funding to pay CONA a $54 billion dividend that it backdated to purportedly be "retroactive" to October 2022. Clm. ¶¶ 33-35. It then amended its December 31, 2022 Call Report by subtracting $56 billion from the amount of uninsured deposits reflected on the report. Clm. ¶ 37.

CONA does not dispute that the FDIC was empowered to promulgate the Final Rule. It does not question the appropriateness of the FDIC's decision, in the Final Rule, to levy the special assessment on banks holding outsized uninsured deposits as of December 31, 2022. It does not dispute that Section 1817(b)(4) requires CONA to preserve "all records" that the FDIC may require to "verify[] the correctness" of the bank's special assessment. 12 U.S.C. § 1817(b)(4). It does not dispute that the FDIC is in fact authorized to verify the accuracy of the uninsured deposit figures shown on CONA's Call Reports. Nor can CONA deny that, under the plain language of Section 1817(a)(2)(B), the FDIC is empowered to "require any insured depository institution to file such additional reports as the [FDIC] . . . may deem advisable for insurance purposes." 12 U.S.C. § 1817(a)(2)(B).

The only thing the FDIC cannot do, in CONA's view, is to compel the bank to reinstate the original version of its December 31, 2022 Call Report so that its special assessment reflects the amount of uninsured deposits actually held by CONA as of the end of 2022. Specifically, CONA asserts that its "primary supervisory agency is the [Office of the Comptroller of the

Currency ("OCC")], and so only the OCC can require such an amendment." CONA Br. at 13 (citing 12 U.S.C. § 1813(q)(1)(A); 12 C.F.R. § 4.2). But the statutory provision on which CONA relies, Section 1813(q)(1)(A), merely states that the OCC is the primary federal regulator for national banks, like CONA, and the regulation that CONA cites, 12 C.F.R. § 4.2 merely describes the responsibilities of the OCC. Neither provision precludes the FDIC from requiring national banks to correct erroneous Call Report submissions that impact their assessments. Nor can either provision be understood to overrule the FDIC's broad power to "require *any* insured depository institution to file such additional reports as the [FDIC] . . . may deem advisable for insurance purposes." 12 U.S.C. § 1817(a)(2)(B) (emphasis added). As CONA acknowledges in its motion, the FDIC instructed the bank to reinstate its original December 31, 2022 Call Report. *See* CONA Br. at 12.

Prior to the current dispute, CONA readily acknowledged the FDIC's broad authority to require the bank to correct errors in its Call Reports that affect the calculation of its assessments. For example, in 2018, the FDIC determined that CONA was inaccurately calculating its exposure to higher risk commercial and industrial loans on Schedule RC-O. *See* FDIC Letter of February 18, 2018 (Exhibit 1 filed under seal, see ECF No. 31). The FDIC instructed CONA that it "***must***" review for accuracy the reported figures and "***amend*** as necessary the amounts reported on its Call Reports for the preceding three years. *See* Exh. 1 at 3. Notably, in its March 30, 2018 response to the FDIC, CONA did not question the FDIC's authority to require the submission of amended Call Reports. To the contrary, CONA assured the FDIC that it would review the accuracy of its prior reporting, and that it would file any necessary amendments to its Call Reports, as the FDIC directed. *See* CONA Letter of March 30, 2018 (Exhibit 2 filed under seal, see ECF No. 31).

28

CONA's new litigating position, if accepted by the Court, would frustrate one of the core objectives underlying the FDI Act and the Final Rule. Specifically, it would prevent the FDIC from carrying out the statutory command to replenish the DIF, following a systemic risk exception, by imposing special assessments. *See* 12 U.S.C. § 1823(c)(4)(G)(ii). CONA and other national banks would be free to evade their fair share of the special assessment through the simple expedient of understating their uninsured deposits on their Call Reports. The FDIC could use its investigative powers to identify banks that underreported their uninsured deposits but, according to CONA, it would be powerless to remedy the problem unless the bank was a state-chartered bank that is not a member of the Federal Reserve system (*i.e.*, a bank for which the FDIC is the primary federal regulator). The FDIC would have no recourse for misreporting by banks supervised by the OCC (national banks) or by the Board of Governors of the Federal Reserve System (state-chartered Federal Reserve-member banks). Simply put, Congress did not exempt national banks like CONA from paying special assessments, and the FDIC did not grant them a license to report inaccurate financial information when it promulgated the Final Rule.

It bears mention that, in addition to incentivizing the misreporting of financial information, CONA's position unfairly would require other banks—those that reported their uninsured deposits correctly—to pay more than their fair share of the special assessment. As of September 30, 2025, the FDIC estimates the DIF will suffer approximately $16.7 billion in losses from the systemic risk exception. *See* 90 Fed. Reg. at 59370. If CONA succeeds in avoiding roughly $150 million of its share of the special assessment, other banks will be forced to close this gap by making additional payments. The Court can avoid this unjust result by rejecting CONA's position and denying its motion for judgment on the pleadings. *See Jackson v. Lykes Bros. S.S. Co.*, 386 U.S. 731, 735 (1967) (rejecting an interpretation of the federal Longshoremen's and Harbor Workers'

Compensation Act that would permit longshoreman employed by a contractor to recover damages caused by an unseaworthy ship while denying recovery to longshoreman employed directly by the ship owner, concluding that Congress could not have "intended any such incongruous, absurd, and unjust result in passing this Act"); *United States v. Brown*, 333 U.S. 18, 27 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences."); *Sorrells v. United States*, 287 U.S. 435, 446 (1932) ("Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned."); *id.* at 448 ("We are not forced by the letter to do violence to the spirit and purpose of the statute."); *In re Brown*, 932 F.3d 162, 171 (4th Cir. 2019) (rejecting a construction of the Crime Victims' Rights Act of 2004 that would produce an absurd result).

## CONCLUSION

For the foregoing reasons, CONA's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1), (6) and 12(c), and its motion for judgment on the pleadings should be denied.

Respectfully submitted,

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew J. Dober
Senior Counsel

/s/ *Andrew A. Nicely*
Andrew A. Nicely (Va. No. 41750)
Sarah E. Paulson (Va. No. 87509)
Jason Benton (NY Bar No. 3994563)
3501 Fairfax Drive, D-7028
Arlington, VA 22226-3500
Tel.: (703) 516-5729
Fax: (703) 562-2477
Email: anicely@fdic.gov

*Counsel for Defendant/Counterclaim-Plaintiff*
Federal Deposit Insurance Corporation

DATED:   February 2, 2026

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record registered to receive such notices.

/s/ *Andrew A. Nicely*
Andrew A. Nicely